[Crim. No. 2564. First Dist., Div. One. Mar. 31, 1949.]

THE PEOPLE, Respondent, v. NILS ARESEN, Appellant.

Nils Aresen, in pro. per., for Appellant.

Fred N. Howser, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

BRAY, J.—Defendant appeals in propria persona from a judgment of the superior court, after jury trial, finding him guilty on three counts of violating certain sections of the Corporate Securities Act [Stats. 1917, p. 673 as amended; 2 Deering's Gen. Laws, Act 3814], and also finding that he had suffered a prior felony conviction and had served a term of imprisonment therefor. His grounds of appeal, set forth generally as conspiracy, perjury and collusion, actually constitute a claim of insufficiency of the evidence. In examining the record of the case we have found that the convictions under the second and third counts cannot be sustained.

### MOTION TO DISMISS APPEAL

Plaintiff moved to dismiss the appeal on two grounds. One of the grounds, namely, that the notice of appeal does not state that it is taken from the judgment or any appealable order, is easily disposed of. While the notice is drawn in layman's language and is by no means a model, it is obvious that defendant desires to appeal from the judgment. It reads: "I . . . do this day move the entitled court that an appeal be granted in my case, on the grounds of conspericy, collusion and that the evidence was and is insufficient to warrant the conviction." The notice is sufficient to constitute an appeal from the judgment.

The second ground presents a more serious situation. It is that the appeal was filed too late. The judgment was rendered September 8, 1948. The notice of appeal, while dated September 15, was not filed until September 20. Rule 31, Rules on Appeal, requires that the notice of appeal be filed with the clerk of the superior court within 10 days of the rendition of judgment. The notice is two days too late, unless the defendant can bring himself within the rule of *People* v. *Slobodion,* 30 Cal.2d 362 [181 P.2d 868]. In an apparent effort to do so, defendant filed an ''Affidavit In Opposition To Motion To Dismiss Appeal,'' which, in effect, constitutes a request to relieve him from his default. In this affidavit he swears that on the seventh day after the rendition of the judgment, to wit, on September 15, in accordance with the rules of San Quentin Prison where he is confined, he delivered the notice of appeal to the ''proper mailing authorities'' of the prison, in an envelope addressed to the Clerk of the San Francisco Superior Court; that there is a regular daily mail between San Quentin and San Francisco and that ''was in ample time for said mail to have been delivered to the Clerk of Said Superior Court in the City of San Francisco, State of California.'' No denial of the allegations of this affidavit has been made. The attorney general stated in open court that he had verified the fact that the notice was delivered to the proper mailing authorities of the prison on September 15, but that he was informed by the trial judge that the envelope was addressed to him instead of to the clerk, and that immediately upon its receipt the judge filed it with the clerk.

Do these facts entitle defendant to be relieved from default? It appears that defendant did all that a prisoner could do to get the notice filed, being, as said in the Slobodion case (p. 366) ''Without direct access himself with the 'clerk of the superior court.' '' He delivered it to the proper authorities for mailing on the seventh day. Three days should have been more than sufficient for the notice to be received by the clerk, if directed to him, or if directed to the judge, for it to have been received by him and turned over to the clerk. In view of the concession by the attorney general hereinafter mentioned that the evidence fails to show that defendant is guilty under the third count, an interpretation of the facts most strongly in favor of defendant should be adopted. In the Slobodion case the prisoner dropped the notice of appeal in the prison mail box

on the fourth day after the rendition of judgment. Three days later the prison mailman returned it to him without explanation. The next day he delivered it to the prison authorities. It was not filed with the clerk until the fifteenth day, five days too late. The court relieved the prisoner from his default, saying (p. 366): "It would be absurd to hold in a criminal case that the state may extend the right of appeal contingent upon timely pursuit thereof and then deny such fundamental right because the state's employees were remiss in complying with the state's law. Such a paradoxical result would have no legal justification, and so it must be said here that when appellant timely deposited his notice of appeal with the state's employees as required by the state prison rules, such action constituted a constructive filing of the specified notice." The concurring opinion of Mr. Justice Carter bases the relief on a different ground, saying (p. 372): ". . . a much sounder theory on which to base the decision would be to hold that when the failure to file a notice of appeal is the result of fraud, mistake, inadvertence or neglect on the part of the adverse party and there is no negligence or lack of diligence on the part of the appellant, the time to file the notice of appeal is extended and the appellant loses no rights thereby. This is the general rule and is supported by a wealth of authority." In a discussion of "Late Appeals in California" in volume 36, California Law Review, page 303, a third and very sound basis for relief (although apparently not recognized in California) is suggested, namely (p. 311): "In criminal cases . . . the interest of the state that justice be done should reinforce the appellant's claim that his appeal be considered on the merits. There late appeals might well be permitted wherever appellant has not been guilty of culpable negligence." Under any or all of these theories, defendant, under the circumstances of this case, is entitled to be relieved from his default.

## FACTS

The general background of this case as shown by the evidence is as follows: Defendant was 65 years of age, a carpenter by trade, who had been crippled and thereafter worked on inventions. In October of 1947, he returned to San Francisco from a visit to Norway. Shortly thereafter he consulted Attorney Keller concerning the organization of a corporation to market his patentable devices. He told the attorney that he wanted to be sure to keep within the law as once before he had been convicted in Minnesota of selling unregistered securities

(the prior conviction which the judgment found he had suffered). Keller agreed to advise him and there were a great many conferences between the attorney and client. Defendant wanted to be advised how he could raise money to get the corporation going and his inventions made and marketed. Keller suggested and prepared for him a preincorporation subscription agreement, but advised defendant that while he could accept signatures to this agreement, he could not and must not accept any cash. Defendant showed Dominic Palmisano and Victor Henricksen a clothespin he had invented and they signed the subscription agreement. Defendant complained to Keller that this arrangement gave him no cash. Keller advised him that while he could not sell stock in the corporation until a permit from the Corporation Commissioner had been obtained, he could borrow money personally on his own promissory note, provided he did not promise stock in the corporation or an interest in his inventions. Keller gave him several blank promissory notes. Palmisano gave defendant $150 and received defendant's note in exchange. Henricksen gave him $50 at one time and $850 at another, receiving a note for $1,000 with the understanding that Henricksen was to put up the other $100 "whenever I got it." Both Palmisano and Henricksen testified that these moneys were paid for stock to be issued when the corporation was organized and were not personal loans. Defendant contends that these payments as well as those made to him by other witnesses were personal loans and that nothing was said about their being in payment of stock to be issued.

Early in December, defendant interested Philip Beargeon in his clothespin and after visiting the engineer for the proposed corporation (as did Palmisano and Henricksen before investing) Beargeon gave defendant $500 early in December, receiving his promissory note in return. On January 15, 1948, Beargeon paid defendant $1,000 more, both payments being made for the purchase of stock when issued. On receipt of the latter sum defendant wrote out, signed and delivered to Beargeon the following document dated the same day: "For the consideration of $1000.00 (One Thousand Dollars) as Mr. P. A. Beargeon agrees to pay in, in order to have more money on hand for expenses, I, Nils Aresen, agree to transfer to Mr. P. A. Beargeon 300 shares of my personal stock as soon as we have the right to do so. And it is understood in case Mr. P. A. Beargeon should care to sell this 300 shares of stock, that I, Nils Aresen, have the first right to buy the

300 shares, and I will pay the market price, or the price as anyone else would pay for the stock.''

On December 19, 1947, the articles of incorporation of the Aresen Wire and Metal Company, Incorporated, were signed by defendant, Palmisano, Henricksen, Farrel (the engineer— he dropped out before the first stockholders' meeting), and one Holme. At the stockholders' meeting January 8, defendant was elected president, Henricksen treasurer, and Palmisano secretary. All three counts of the indictment are directed to defendant's dealings on January 17 with Wendla Ness and John T. Ness, husband and wife. These dealings will be discussed later. About February 17 or 19, defendant went to Salt Lake City, leaving with his wife a power of attorney to represent him. Mrs. Aresen was told by Keller that there was a possibility of her husband being arrested (apparently for his transactions with Henricksen, Palmisano and Beargeon). A meeting was had between these three and Mrs. Aresen in Keller's office. The three men claimed that Aresen had promised them some of his promotional stock, and on Keller's advice, Mrs. Aresen gave 5 per cent thereof to each. Mrs. Aresen put in escrow $1,800 of her own money, plus $400 her husband had given her before he left ''as partial security that nobody is going to lose anything.'' Defendant registered in Salt Lake City as coming from Portland, Oregon, and used an assumed name, because, he told Inspector Wall later, ''he expected trouble and he didn't want to be arrested.''

### Count I Charge

Defendant is charged in count I with violation of section 33 of the Corporate Securities Act (Stats. 1917, p. 673, as amended; 2 Deering's Gen. Laws, Act 3814), in that on or about the 17th day of January, 1948, he ''did willfully, unlawfully, and feloniously accept and receive the sum of One Thousand Dollars ($1,000.00) in money, lawful money of the United States in consideration of the sale by defendant to Wendla Ness and John T. Ness, of one hundred (100) shares of stock at Ten Dollars ($10.00) per share, in the Aresen Wire and Metal Company, Inc., when no permit had been issued by the Commissioner of Corporations of the State of California authorizing and permitting the sale of said security.'' Section 33, after providing that subscriptions for shares of a corporation may be made prior to incorporation and to obtaining the Corporation Commissioner's permit to issue shares on certain conditions not important here, states:

"... nothing herein contained shall be construed as permitting the collection of any portion of the consideration to be paid on account of such subscriptions, unless and until a permit shall have been issued by the commissioner authorizing such collection; . . . nothing herein contained shall be construed as permitting the taking of subscriptions for any security of any company other than a domestic or foreign corporation or to make collection of any portion of the consideration to be paid on account of subscriptions unless and until a permit shall have been issued by the commissioner authorizing the taking of such subscriptions or the collection thereof." Section 18 makes any sale contrary to the provisions of the act, or any violation of any provision of the act, a public offense.

## COUNT I FACTS

In addition to the background above mentioned, there is the testimony of Wendla Ness and John T. Ness. Wendla testified that at her sister's place (her sister is the wife of Henricksen) she met defendant who showed her the clothespin, explained to her about the corporation and that he had a lot of inventions, all of which would go into the corporation; that on the 17th of January, the third time she had seen defendant, she brought with her her husband who had drawn $1,000 out of the bank at her suggestion. Defendant explained to them about the corporation and asked if they would invest in it. At first they said they would invest $500 and defendant suggested that they let him have $1,000, "and then you can get your stock quicker." For this sum defendant said they would get 100 shares, of the value of $10 per share, in about a week or 10 days. They paid him $1,000 and he gave them a promissory note, which he signed in their presence. This note was introduced in evidence and is in the usual form of a promissory note, there being no mention of stock or the incorporation in it. Defendant at no time said anything about a loan.

John T. Ness testified that he knew about the clothespin from his nephew, Henricksen Jr.; that he drew the $1,000 out of the bank; that on the night of January 17, defendant, a Miss Hedman, Victor Henricksen, Henricksen's wife and his mother, came to the Ness home. Defendant had the clothespin with him, and stated that "they were going to work and organize a corporation and they were going to apply for stock when they had enough money." The corporation was to be named Aresen's Wire and Metal Company, or some similar name.

They talked about other inventions of defendant which were to be thrown into the corporation. Ness invested $1,000 for which he was to get 100 shares of the corporation. After defendant received the money he said, "Now, I have enough. We close the books. We have enough money to make a start, and the next thing is to apply for a permit from the Corporate Commission and you will have the stock within a week or ten days." Defendant signed the note. There was nothing said about a loan. Defendant stated that he "issued that note until we got the stock and then he wanted that note back again."

The testimony of Mr. and Mrs. Ness was corroborated by Miss Aina Hedman, Victor Henricksen, Mrs. Gladys Henricksen and Mrs. Victor Henricksen. Defendant testified, admitting the receipt of the $1,000, as well as the sums before mentioned paid by other persons, but claiming that at no time did he represent that he was selling or that the persons were buying, any stock whatever or that they were subscribing for stock. He claimed, further, that, pursuant to the advice of his attorney, Keller, he was very careful to explain that the moneys were being given as personal loans for which he was giving his personal note. Defendant further points out that these witnesses were all related to the Nesses and to one another, and claims that they conspired together to put him in prison, so that Henricksen, Palmisano and Beargeon might secure for themselves the control of the corporation and defraud him of his inventions, which the corporation now owns. The conflict in the testimony and the motives of the witnesses were all matters within the province of the jury. There is ample evidence that the $1,000 admittedly paid to defendant was for the purchase of stock to be issued, and was not paid as a loan.

Defendant contends that his counsel at the trial lied to and misled him, incompetently handled his case, and that the prosecution was guilty of improper conduct and "leading questions." Defendant fails to point out any specific instances of any of these matters. We have carefully examined the record and find nothing to support the charges against his counsel. On the contrary, the evidence demonstrates that his counsel diligently and conscientiously represented him. In a few instances, the prosecution asked leading questions of witnesses, but defense counsel promptly objected and the objections were sustained. We can find no evidence of improper conduct by the prosecution.

There are some contradictions in the testimony. For example, Mrs. Ness testified that defendant came alone to her home on the night of January 17. Both her husband and Gladys Henricksen testified that others came with him. The effect of those contradictions was for the jury to determine. There is no inherent improbability in any of the testimony. Defendant makes other charges, such as that "It is evident from her testimony and her nervous condition that she has been coached, but not well enough," referring to the testimony of Mrs. Ness. Again, this was a matter for the jury to consider.

We have examined the rulings of the court on introduction and exclusion of evidence and find no error. Nor can we find any error in the instructions given to the jury. ■ One of the instructions stated that acting on the advice of counsel would not be a defense if it was a fact that defendant's conduct constituted a crime. This principle is supported by *People* v. *McCalla*, 63 Cal.App. 783 [220 P. 436], where the conviction of the defendant for selling a security without a permit was upheld. The defendant's main defense was that he acted under advice of counsel and did not know that the instrument he was selling constituted a "security." The court held that intent is not made an affirmative element of the crime set forth in the Corporate Securities Act. The statute forbids the act, regardless of intent. While in our case defendant claims that he was acting under advice of counsel, still both he and his counsel agree that he was informed that he must not accept money on account of the sale or subscription for stock; that the giving of a note must be as evidence of a personal loan completely independent of any stock transaction. The defendant contends that the notes were given independent of such a transaction. The prosecuting witnesses testified to the contrary. The jury believed those witnesses.

■ Defendant complains that at the end of the taking of testimony the court refused to let him testify further. Under examination by his counsel, defendant had testified at great length. Upon completion of the direct examination the district attorney asked defendant's counsel if he had finished with the direct examination. On being answered in the affirmative, the district attorney announced that he would not cross-examine. Thereupon the defendant stated: "There is some things I would like to say." The court then said: "Well, you had your chance on direct examination, sir." Defendant said: "That I must say before I get through. THE COURT: Well, you have had your chance. Is that all, Mr. Douglas? MR.

DOUGLAS [defendant's counsel] : Yes. That is our case." In view of the fact that defendant's counsel rested his case there is no error in the action of the court.

## THE INDICTMENT

While the defendant does not raise the point we deem it advisable to pass upon the sufficiency of the indictment. The count, in effect, charges defendant with violating section 33 by accepting and receiving $1,000 in consideration of the sale without a permit of 100 shares of stock in the corporation. Section 33 does not refer to a sale. It prohibits the collecting of any money on account of stock or security subscription. The offense set forth in the charging part of the indictment is really a violation of section 18, which prohibits the sale of stock without a permit. However, this error in the number of the section is immaterial. As the specific acts constituting the offense with which the defendant is charged are set forth in the indictment with sufficient clearness to show the crime with which defendant is charged, the designation of the wrong section is immaterial. (*People* v. *Eppinger*, 105 Cal. 36 [38 P. 538] ; *People* v. *Adair*, 3 Cal.App.2d 323 [39 P.2d 274].) That the acts of defendant in delivering his personal note to persons to whom he was selling stock is not a defense to a charge of violating the Corporate Securities Act by knowingly selling stock without a permit, is well shown in *People* v. *Sidwell*, 27 Cal.2d 121 [162 P.2d 913]. There the defendant gave a note which stated "that this transaction does not constitute a sale or a purchase" of the interest in an oil well which the defendant was selling without a permit. The court upheld the conviction of defendant for violating the act.

## COUNT II

In this count, defendant is charged with violating section 3 of the Corporate Securities Act in that he did unlawfully and feloniously sell to Wendla and John T. Ness "an instrument in writing evidencing and representing to be one hundred (100) shares of the ARESEN WIRE AND METAL COMPANY, INC., stock, for . . . the sum of ONE THOUSAND DOLLARS ($1,000.00) . . . the said defendant being at said time and place an officer and director in the aforesaid purported corporation formed under the laws of the State of California for profit, and that the aforesaid stock was then and there offered to the public for sale and sold to the said WENDLA NESS and JOHN T. NESS by the said defendant NILS ARESEN, without

the said defendant or anyone else having first applied to, or obtained a permit from, the Commissioner of Corporations of the State of California so to do.''

Section 3, so far as it applies here, provides that no company shall sell or offer for sale any security without the permit of the Corporation Commissioner first having been obtained.

There is no evidence to support the conviction under this count. While the charging portion of this count is the important part, it is evident that defendant did not violate section 3, which prohibits a ''company'' from selling a ''security'' without a permit. Of course, the company did not make any sale of anything, nor authorize defendant in any way to act for it, even though defendant was president of the company. Subdivisions 3 and 6 of section .2 of the act include in the definition of ''company'' an individual who without a permit sells, offers for sale or takes subscriptions for any security of his own issue. (See, also, *People* v. *Woodson*, 78 Cal.App.2d 132 [177 P.2d 586].) Under the act, a promissory note may be a ''security.'' However, there is no evidence that defendant was selling or offering for sale, his notes. Everyone with whom he dealt, understood they were buying stock in the corporation and not buying his note. Again, the charging portion of this count does not charge him with selling his note. It charged him with selling ''an instrument in writing evidencing and representing to be one hundred (100) shares of the'' company stock, and there is no evidence that at any time he sold, or offered for sale, such an instrument. The only written instruments in the case are the defendant's promissory notes, which did not purport to represent 1ρ0 shares of stock. Those who received them, the testimony shows, regarded them as ''receipts'' for money paid for stock which defendant represented would be delivered to them when issued. Insofar as this count charges defendant with selling the stock itself to Mr. and Mrs. Ness without a permit, it is merely a repetition of the charge in the first count. A defendant may not be convicted twice for the same act and charge.

## Count III

Inasmuch as the attorney general concedes that there is no evidence to support the conviction under this count, little need be said about it. The charge is violating section 6 of the Corporate Securities Act by acting as ''an agent and broker for the sale of an instrument in writing evidencing and representing a right to participate in the earnings and

profits derived from the business carried on by the ARESEN WIRE AND METAL COMPANY, INC., for profit without first having applied for and secured from the Commissioner of Corporations of the State of California, a certificate authorizing the said defendant to do so.'' There is no evidence whatever that the defendant was attempting to act as an agent or broker, or that the instruments in writing given by him were ones ''evidencing and representing a right to participate in the earnings and profits derived from the business carried on by the Aresen'' company.

As to the first count, the judgment is affirmed. As to the second and third counts respectively, the judgment is reversed.

Peters, P. J., and Ward, J., concurred.

A petition for rehearing was denied April 15, 1949, and the following opinion was then rendered:

THE COURT.—The contention in the petition for rehearing (not heretofore made) that the court erroneously failed to instruct the jury under section 18 of the Corporate Securities Act [Stats. 1917, p. 673; 2 Deering's Gen. Laws, Act 3814], is well answered by the fact that the court in its original instructions and in the additional instructions requested by the jury, although not mentioning section 18, fully instructed on all the elements of the crime defined by that section and charged in the charging portion of count I of the information. The other contention made by petitioner is covered in our opinion.

Appellant's petition for a hearing by the Supreme Court was denied April 28, 1949.