[Crim. No. 36674. Second Dist., Div. Five. Oct. 30, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
NORMAN VINEBERG et al., Defendants and Appellants.

COUNSEL

Richard H. Kirschner for Defendants and Appellants.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and William V. Ballough, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WOLF, J.*—**The defendants were convicted of seven counts of grand theft arising from the sale by them of gold and silver which was stored with their company, United States Silver Corporation (hereinafter referred to as U.S. Silver).

## THE FACTS

Defendants Norman Vineberg and Douglas Todd Parker were at all times relevant to these proceedings, the owners, operators, and persons in control of U.S. Silver. U.S. Silver was in the business of buying, selling and storing gold and silver coins and bullion. As respects its storage operation, U.S. Silver maintained a vault on its premises and advertised for storage customers, stressing the safety of placing the precious metals in its vault for safekeeping.

In addition to storing its own gold and silver in its vault, U.S. Silver stored gold and silver purchased by its customers on margin and gold and silver which was wholly owned by the storage customers. U.S. Silver did not segregate company-owned bullion from customer-owned bullion, nor was the property of one storage customer segregated from the property of the others.

During the years of 1974 and 1975, each of the seven persons who are named as victims in the seven counts with which this appeal is concerned, along with many others, stored silver bullion in the form of bars and gold coins and medallions with U.S. Silver. The storage agreement did not authorize defendants to use the stored property in their personal business, nor did defendants ever receive permission to use the stored property for their own purposes from any of the persons who stored their property with U.S. Silver.[1]

The significant part of defendants' business consisted of arbitrage transactions: The simultaneous buying and selling of a given commodity

---

*Assigned by the Chairperson of the Judicial Council.

[1] The defendants were also convicted of stealing silver and gold held in storage which was the property of customers who had purchased the material on margin or who had borrowed money against the property. The trial court granted defendants' motion for a new trial as respects these counts and they were subsequently dismissed on motion of the prosecution. Thus, the counts with which this appeal is concerned involve gold and silver which was wholly owned by the customer and placed with U.S. Silver for storage.

to capitalize on a price differential. Thus, by selling a given quantity of gold and silver and simultaneously purchasing a contract for the future delivery of the same amount of gold and silver at a lesser price, the profit could be engendered allegedly without the risk of any loss.[2]

Defendants envisioned that they could sell the gold and silver belonging to their customers, which was stored in their vault, and simultaneously purchase futures contracts for a lesser amount, thereby making a profit without risking a loss of their customers' property. Defendants testified that they asked their attorney for an opinion as to whether their liability to storage customers could be covered by the purchase of futures contracts so that the physical inventory belonging to the customers could be arbitraged to increase U.S. Silver's profits. Defendants further testified that, in response to their request, their attorney advised them that he had written a letter to the Department of Corporations seeking permission to cover storage liabilities by the purchase of futures contracts, and that he had received a letter granting U.S. Silver permission to sell the storage inventory and cover the storage liabilities with futures contracts and working capital.[3]

After the receiving and reviewing of the letter from the Department of Corporations, defendants began to sell the storage inventory as part of its arbitrage operation.

Defendants' alleged riskless use of their customers' property became extremely risky because defendants did not utilize all of the proceeds from the sale of the stored material for the purchase of futures contracts. The futures contracts were purchased on margin, requiring that only a portion of the purchase price be paid immediately in cash. A

---

[2]Defense counsel in his opening statement equated these complex business arrangements to a bookmaking operation. The bookmaker, he explained, does not take a position on the outcome of the game. He keeps his books balanced (referred to as a "zero position") by taking in the same amount in bets on each team. He makes his profit by requiring the bettor to give odds with the result that he will pay out to the winners less money than he takes in from all of the persons who bet.

[3]The attorney died prior to the commencement of the trial and did not testify. The letter which the attorney purportedly wrote to the Department of Corporations could not be found in either the files of the deceased attorney or Department of Corporations. The defendants did not see the letter which was written by their attorney. A letter was written by the Department of Corporations addressed to defendants' attorney, dated April 8, 1975, which makes reference to the receipt by the Department of Corporations of a letter of March 27, 1975, requesting approval of the department to use certain price-related commodities as cover for customer commodity liabilities. The copy of this letter is attached to this opinion as an exhibit.

substantial portion of the proceeds from the sale of the stored property was utilized by the defendants for the payment of items such as salaries, bonuses, attorney's fees, advertising expenses, and other items of overhead. In this regard, an amount in excess of $100,000 was paid into a pension and profit sharing plan for employees. Defendants each received substantial salaries ranging from $1,000 per week in October of 1974 to $2,000 per week commencing in October of 1975, and each received bonuses from time to time in 1975.

Defendants testified that they conducted their business in this manner because they believed that their arbitrage operation was extremely profitable, and that they always had enough liquid assets and futures contracts to fully cover their liability to storage customers. This belief, they testified, was based upon financial information given to them by their controller indicating that U.S. Silver made a substantial profit for the year ending October 1975. This, however, was not the case. A number of accounting errors had been made by the controller which involved more than $1 million in unrecorded liabilities and duplicate sales. A year-end audit disclosed that the business had, in reality, incurred a substantial deficit.

Defendants became aware of these accounting errors in February 1976, attempted to reduce their overhead expenses, and notified the Department of Corporations that, as a result of these errors, U.S. Silver had fallen below the liquidity requirements of the department. After a series of meetings, a receiver was appointed to take over the operations of U.S. Silver. A subsequent audit revealed that as of the date the receiver took possession of the business, the liability to customers for stored inventory was approximately $1.4 million greater than the total inventory that was in the vault.

The seven persons named as victims in those counts, involved in this appeal, have not received any part of their stored property back from the defendants.

Defendants do not deny that they sold the stored property without permission, nor do they now make the claim that they had the legal right to do so.[4] The essence of their defense is at the time of the sale of

---

[4]Defendants' position in their pretrial motions and at the time of trial was that it would have been lawful for the defendants to have sold the stored material if the customers' position had been adequately covered by liquid assets and futures contracts. This theory was based upon an interpretation of section 350.537.6 of title 10 of the

the stored material, they had the mistaken belief, based upon what had been told to them by their accountant, that they were solvent and had enough assets to cover their liability to the customers, and that they had the further mistaken belief, based upon what was told to them by their attorney, that they had the legal right to sell their customers' stored bullion as part of their business operations.

## THE DEFENSE OF MISTAKE OF FACT

◼ Defendants requested that the following jury instruction be given: "An act committed or an omission made under an ignorance or mistake of fact which disproves any criminal intent is not a crime.

"Thus a person is not guilty of a crime if he commits an act or omits to act under an honest belief in the existence of certain facts and circumstances which, if true, would make such act or omission lawful."

The trial court refused to give the requested instruction and instead read the jury the instruction contained in CALJIC No. 4.35.[5]

The only alleged mistake of fact purportedly made by defendants (as opposed to mistake of law which will hereinafter be discussed) was the mistake relating to the financial condition of U.S. Silver. This mistake, however, would serve to justify defendants' conduct only if defendants would have had the right to sell the stored commodities had the accountant's financial data been accurate.

They would have had no such right.

The storage customers deposited their personal property with defendants for safekeeping and defendants agreed to return the property to the customers on demand. Thus, a bailment was created. In the absence

---

California Administrative Code (these regulations were subsequently repealed in 1980), which permitted a margin coin dealer to provide cover with commodities deliverable under futures contracts. Defendants urged that rules pertaining to the margin coin dealer were equally applicable to the storage of customer bullion. Defendants have apparently recognized the total lack of merit in this position and make no such contention on appeal.

[5]CALJIC No. 4.35 states: "An act committed or an omission made under an ignorance or mistake of fact which disproves any criminal intent is not a crime.

"Thus a person is not guilty of a crime if he commits an act or omits to act under an honest and reasonable belief in the existence of certain facts and circumstances which, if true, would make such act or omission lawful."

of a contractual authority to do so, any use of the bailed property by the bailee is improper. (Civ. Code, § 1835.) There was no provision in the California Administrative Code, or in any other statute to which defendants have alluded, which permits a person to whom property has been entrusted for storage and safekeeping to utilize such property as part of his business operations without the specific authorization of the owner.

Therefore, defendants' alleged mistaken belief in the accuracy of the financial data given to them would not have formulated a defense to the charge of theft and the jury need not have been so instructed.[6]

Defendants rely upon *People* v. *Navarro* (1979) 99 Cal.App.3d Supp. 1 [160 Cal.Rptr. 692], in support of their position that they were entitled to an instruction to the effect that an honest mistake of fact, even if not based upon reasonable grounds, is a defense to a crime of theft. Defendants' reliance on *Navarro* is misplaced.

The mistake of fact involved in the *Navarro* case concerned whether the lumber which was left on the construction site had been abandoned by the owner. The defendant claimed that he so believed, and, if his belief had been accurate, he would have had the right to have taken the lumber.

In the instant case defendants at no time made the claim that they believed they had permission of their storage customers to sell the stored commodities. To the contrary, the evidence established that defendants never asked permission of the storage customers to sell their property, and defendants made it a matter of their business tactics not to tell the customers of their use or intended use of the storage property.

The trial court did not err in failing to give the requested instruction on mistake of fact.

---

[6]The mistaken belief as to financial data might have some bearing upon whether defendants had the requisite specific intent to permanently deprive the owners of the stored commodities of their property at the time the property was sold. The jury was adequately instructed that such specific intent was necessary for a conviction. The jury by its finding of guilt impliedly found the existence of such specific intent notwithstanding the evidence adduced by defendants which purported to show their mistaken belief in their company's financial position.

## Mistake of Law

■   The People assert that a mistake of law based upon the advice of counsel is not a defense to a criminal charge. This proposition is valid as respects general intent crimes. Thus, in *People* v. *McCalla* (1923) 63 Cal.App. 783, 793 [220 P. 436], and *People* v. *Aresen* (1949) 91 Cal. App.2d 26, 35 [204 P.2d 389], it was held that it is not a defense to an alleged violation of the Corporate Securities Act, a crime which does not require a specific intent, that the defendant believed his conduct was lawful based upon the advice of his counsel.

■   This principle, however, has no application with respect to crimes requiring a specific intent. It has been recognized in California since the turn of the century that ignorance or mistake of law can negate the existence of a specific intent, and that it is a valid defense to a charge of theft that the accused honestly believed that he had the right to take the subject property even if such belief was based on a misconception of the law. (*People* v. *Goodin* (1902) 136 Cal. 455, 458-459 [69 P. 85].) It has also been recognized, however, for approximately the same length of time, that an accused is only entitled to such an instruction if the evidence supports a reasonable inference that any such claimed belief was held in good faith. (*People* v. *Holmes* (1910) 13 Cal.App. 212, 217 [109 P. 489].) The assertion by an accused that he believed that he had the right to appropriate the property of another does not compel the giving of the instruction if the circumstances do not indicate that such belief was held in good faith. In this regard the Supreme Court in *People* v. *Stewart* (1976) 16 Cal.3d 133, 140 [127 Cal. Rptr. 117, 544 P.2d 1377], stated as follows: "Subsequent cases have explained that, 'Whether a claim is advanced in good faith does not depend solely upon whether the claimant believes he was acting lawfully; the circumstances must be indicative of good faith.' (*People* v. *Martin* (1957) 153 Cal.App.2d 275, 283 [314 P.2d 493]; accord, *People* v. *Scholder* (1956) 143 Cal.App.2d Supp. 836, 839 [300 P.2d 384].) For example, the circumstances in a particular case might indicate that although defendant may have 'believed' he acted lawfully, he was aware of contrary facts which rendered such a belief wholly unreasonable, and hence in bad faith. . . ."[7]

---

[7]The *Stewart* court upheld the trial court's refusal to instruct the jury in an embezzlement case that a belief by the defendant that he was acting within the scope of his authority was a defense to the charge because the instruction did not specify that the belief had to be held in good faith. A number of instructions of similar import were requested by defendants in the instant case, which instructions were properly refused by

■ There is no evidence in the instant case from which it can be reasonably inferred that defendants' alleged belief that they had the right to sell the property which had been entrusted to them for storage purposes was a good faith belief. To the contrary, from the facts known to defendants, any such belief would have been unwarranted and in bad faith. Defendants knew that the property entrusted to them for storage purposes was given to them for the purpose of safekeeping, and that they had no authorization from the owners of the property to use the property in their business; that the warehouse receipts which they issued to their customers identified the storage property by lot numbers and indicated that the customers could reclaim storage property at any time; that it was their business practice not to notify the customers of their use of the stored property, nor ask permission of the customers to use the stored property; that any profits derived from the use of the stored property would enure solely to the benefit of defendants, and the customers would not participate in any profits engendered by the sale of their property; that there was no law, rule or regulation which permitted defendants to sell storage property without customer authorizations.

Further, the letter from the Department of Corporations of April 8, 1975, could not serve as a basis for the formulation of such a good faith belief. It is totally unsusceptible of an interpretation which would permit defendants to take possession of property which had been entrusted to them for storage purposes, and to use such property in their business without the consent of the owners. Defendants' assertion that they believed their attorney when he told them that this letter authorized such activities is also wholly unreasonable.

In the absence of some evidence from which it can be inferred that defendants' alleged belief in the lawfulness of their conduct was in good faith, the court was under no duty to instruct the jury that a good faith mistake of law constituted a defense to the action.[8]

---

the trial court. These instructions included the following: "A defendant has a right to rely on the advice of an attorney with respect to his legal rights and obligations.

"If you find that an attorney told a defendant that he had the right to sell storage coins or bullion and cover for such storage with quick assets and futures contracts, and that a defendant did so do based on such advice, you must acquit each defendant on each count where such conduct is the theory upon which the prosecution bases its case.

"If you find that a defendant undertook any activity in this case with the belief that such activity was approved by the State of California, you must acquit a defendant for any count predicated on such activity."

[8]The conviction in *People v. Stewart, supra,* 16 Cal.3d 133, 140, 142, was reversed because the trial court failed, *sua sponte,* to instruct the jury that a good faith belief in

## THE FORM OF THEFT COMMITTED

■ Defendants contend that it was error for the trial court to instruct the jury that they need not agree on the form of theft committed by defendants. (CALJIC No. 14.47.)[9]

The People's position at the trial was that defendants committed grand theft by either committing larceny by trick at the time defendants took possession of storage property because they then entertained the intention to convert it to their own use, or by embezzling the property after it had been entrusted to their safekeeping. Defendants assert that since the receiving of the property and the selling thereof came at different times and consisted of two different acts, it was conceivable that, under the court's instruction, some of the jurors may have found that there was larceny by trick, while others might have found that there was an embezzlement, with the result that the jury may not have unanimously agreed as to the act upon which the finding of guilt was based. This contention is imaginative but not based in reality. Any juror who found that defendants took possession of the property with the intent to convert it to their own use at some later time (theft by trick) must certainly have also found that defendants committed an embezzlement when the property was in fact sold. Thus, the jurors unquestionably agreed unanimously that a theft was committed when the stored property was sold, irrespective of when they believed that the intent to steal was first formulated.

It is unnecessary for a jury to agree upon the method by which a theft is committed. (*People* v. *Nor Woods* (1951) 37 Cal.2d 584, 586 [233 P.2d 897].) The trial court's instruction to the jury is a correct statement of the law and was properly given.[10]

---

the right to use the property in question constituted a defense. The facts of the *Stewart* case, however, unlike the facts of the instant case, indicated that the claimed belief in the lawfulness of defendant's conduct was in good faith. The defendant in *Stewart* testified that he had received permission from the person he believed was a sole owner of the company to write checks and use money for his own investments, and he did so openly without any attempt to conceal the taking of the funds. .(*Id.* at p. 138.)

[9]The instruction given was as follows: "If you agree unanimously that defendant committed the crime of theft, you should find the defendant guilty, and you are not required to agree as to which particular form of theft the defendant committed."

[10]Although defense counsel objected to the trial court giving CALJIC No. 14.47, he did not request that the court give CALJIC No. 17.01, which states: "The defendant is charged with the offense of _____ . He may be found guilty if the proof shows beyond a reasonable doubt that he committed any one or more of such acts, but in order to find the defendant guilty, all the jurors must agree that he committed the same act or

## SUFFICIENCY OF THE EVIDENCE

■ Defendants contend that the evidence was insufficient to support a finding that defendants took any of the property belonging to the seven persons named as victims in those counts involved in this appeal. This contention proceeds upon the theory that it was not enough for the prosecution to prove that a shortage existed among all of the storage customers, but the prosecution was required to prove that the particular property stored by the seven victims was property which defendants sold in the course of their business. This, defendants assert, the prosecution failed to do because the evidence established that when the receiver took possession of the defendants' business there was sufficient amount of inventory on hand to cover the amount deposited by each of the seven named victims.

There is no merit to this contention. The evidence established that defendants commingled property of the numerous storage customers into a common pool, removed property from this pool, and sold it in the course of defendants' business operations. By the time the receiver took over the operation of the business, approximately $1.4 million in stored property was missing from the vault. The pool of property was depleted by defendants to a point where none of the property which they had placed in storage by the seven named victims was ever returned to them. This evidence amply supports the jury's implied finding that their property was taken from them.

## EVIDENCE OF DEFENDANTS' COURSE OF CONDUCT

■ Defendants contend that the court erred in admitting evidence that defendants failed to segregate the stored bullion and failed to comply with certain other regulations of the Department of Corporations in the conduct of their business. They further contend that this error was compounded by the trial court's instruction to the jury regarding the legal nature of a warehouse receipt[11] because it invited the jury to consider commingling as evidence of theft.

---

acts. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict."

CALJIC No. 17.01 would have nailed down the problem which defendants appeared to find so troublesome. We do not concur with defendants' contention that defendants may have been deprived of a decision by unanimous jury under the instructions given and, accordingly, we find that the trial court had no *sua sponte* duty to give CALJIC No. 17.01 to the jury.

[11]The trial court instructed the jury as follows: "Unless the warehouse receipt otherwise provides, a warehouseman must keep separate the goods covered by each receipt

The concept of commingling, however, was not introduced into the case by the prosecution but was mentioned for the first time by the defense counsel in his opening statement. The jury was then told that the evidence would establish that the property stored by defendants was fungible in nature and that it was unnecessary for defendants to keep the stored property in separate lots. Thereafter, throughout the trial, defendants attempted to elicit evidence from a number of witnesses in an effort to prove that the stored property could lawfully be commingled and, for the most part, did not object to questions asked by the prosecutor in this area. Moreover, not only did the defense counsel not object to the giving of the instruction now challenged on appeal, which defines when stored property need be and need not be segregated, but himself requested that instruction of a similar import be given.

Thus, defendants during the trial regarded evidence as to the manner in which defendants conducted their business as relevant to the issues involved in the proceedings and may not now validly claim such evidence should not have been admitted. The instruction given by the trial court was an accurate statement of the law on a subject which defendants wanted covered by the instruction. The instruction did not, as defendants contend, suggest to the jury that the commingling of the stored property was evidence tending to show that the property was stolen. Defendants suffered no prejudice by the giving of the instruction.

We find defendants' remaining contentions that the district attorney was guilty of misconduct in connection with his cross-examination of defendant Vineberg, and that defendants were unduly restricted in their cross-examination of certain prosecution witnesses, to be unpersuasive. Defendants received a fair trial. The evidence of their guilt was substantial.

The judgments of conviction are affirmed.

Ashby, Acting P. J., and Hastings, J., concurred.

A petition for a rehearing was denied November 25, 1981, and the opinion was modified to read as printed above. Appellants' petition for a hearing by the Supreme Court was denied January 20, 1982. Kaus, J., did not participate therein. Broussard, J., was of the opinion that the petition should be granted.

---

so as to permit at all times identification and delivery of those goods except that different lots of fungible goods may be commingled."

STATE OF CALIFORNIA
DEPARTMENT OF CORPORATIONS

EDMUND G. BROWN JR, Governor

Los Angeles, California
April 8, 1975

IN REPLY REFER TO:
FILE NO. °923 9105

Rubin & Mayorga
Attorneys at Law
8383 Wilshire Boulevard, Suite 1026
Beverly Hills, California   90211

RECEIVED
APR 9 1975
RUBIN & MAYORGA

Attention: Henry H. Rubin, Esq.

Reference: *UNITED STATES SILVER CORPORATION*

Gentlemen:

We have received your March 27, 1975 letter requesting our approval
to use certain price related commodities as cover for your customer
commodity liabilities.

United States Silver Corporation is hereby granted permission to
(1) use the following price related gold commodities as cover for
each other, and (2) use the following price related silver
commodities as cover for each other, provided that coverage will
be computed by using the market value (unaffiliated supplier ask)
of these commodities, and "unit" coverage will have no relevance
for computations made pursuant to Section 350.537.6(c)(1):

### PRICE RELATED GOLD COMMODITIES

1. Austrian Coronas     (10 and 100)
2. Hungarian Coronas    (10 and 100)
3. Mexican Pesos
4. British Soveriegns
5. Ducats
6. Gold Bullion
7. Kruger-Rands

### PRICE RELATED SILVER COMMODITIES

1. Silver Bullion
2. Pre-1965 Silver Coin Bags
3. 1965-1969 Silver Coin Bags (subject to the following
   restrictions)

| LOS ANGELES 90005 | SACRAMENTO 95814 | SAN DIEGO 92101 | SAN FRANCISCO 94108 |
|---|---|---|---|
| 790 S. COMMONWEALTH AVENUE | 1025 P STREET | 1350 FRONT STREET | 600 CALIFORNIA STREET |

Rubin & Mayorga                                    April 8, 1975
Reference:  UNITED STATES SILVER CORPORATION    File No. 923 9105

We will not permit 1965-1969 silver coin bags (clads) to be used
as a price related commodity whenever the New York silver spot
price is less than $3.50 an ounce.

Sincerely,

*WH Sharpe*

W. H. SHARPE
Specialist
Commodity Law

WHS:fn