Filed 2/24/14  P. v. Henry CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048361 |
| v. | (Super. Ct. No. 13HF0103) |
| FLORENCE ABIGAIL HENRY, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gary S. Paer, Judge.  Affirmed.

Reed Webb, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry J. Carlton and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury found defendant Florence Abigail Henry guilty of two counts of child abduction in violation of Penal Code section 278.5, subdivision (a). The court suspended imposition of sentence and placed defendant on three years' formal probation. One of the terms and conditions of probation was serving 180 days in jail, but that condition was stayed pending successful completion of probation with no probation violations.

On appeal, she contends the court erred in instructing the jury. She argues the court had a sua sponte duty to instruct on a mistake of fact because there was substantial evidence negating malice. We affirm.

I

FACTS

Adon Henry (Henry) and defendant were married for 12 years and divorced in 2007. Their twins were born in 1999. Henry is now married to Tracy Henry (Tracy).

An original settlement agreement between Henry and defendant provided a right of first option to care for the twins, which meant that either parent had the opportunity to watch over the children while the first parent was dealing with an emergency. Since that time, however, there have been six court orders. In the 2007 court order, defendant had physical custody of the twins, but in 2009, the court awarded primary physical custody of the twins to Henry.

On December 30, 2012, Henry accompanied his mother back to her home in Jamaica with the intention of staying with her for one or two weeks. He returned on January 13, 2013. From the time he was awarded physical custody until the trip to Jamaica, he had never been away from home overnight. It was his intention the twins would stay with Tracy and with defendant's father, Edward Dutcher, while he was in Jamaica.

2

When the twins were exchanged for visits, the exchanges took place at the Irvine Police Department. With regard to communications between defendant and Henry, pursuant to a court order, they communicated through a Web site called The Family Wizard. But Henry says they also communicated by e-mail and that he sent defendant an e-mail advising her he "was thinking about taking [his] mom back to Jamaica," and would let her know if that was going to be the case. Defendant responded, saying something like, "That's not okay with me."

Henry, who lived in Irvine, prepared a document to "make sure I was going to stick with the court order and follow the rules and make sure she get her parenting time what it was supposed to be." Four or five visitations with defendant were to take place while Henry was gone. Tracy took a copy of the document to the Irvine Police Department. Dutcher testified he was given a copy, too, and explained: "He had planned out the whole period of departure, and he gave me copies of that. Then he also gave me a statement showing the appropriate visitation rights of [defendant]." Dutcher said Henry also gave him a calendar with authorized visitation dates, and instructed him not to let the twins out of his sight while they were with him.

Henry testified he did not give defendant permission to take the twins out of California. No right of first option was in the court's visitation order in effect at the time. Henry said he had no reason to believe a right of first option was in effect while he was gone.

On Sunday, December 30, 2012, Tracy was out of town for work. The plan was for the twins to spend Sunday and most of Monday with Dutcher, and for Tracy to pick them up on Monday and take them to Knott's Berry Farm for a New Year's Eve celebration.

Dutcher testified on Monday he told defendant she could come by, explaining he knew defendant did not have visitation rights that day but that he "didn't

3

know that she couldn't be around the [twins] whatsoever." While Dutcher and the twins were at a basketball court in the local park that day, defendant came by somewhere between 2:30 and 4:30 p.m.

At the conclusion of the park excursion, Dutcher instructed the twins to get into his car. He was asked what defendant did at that time, and responded: "She was walking, I believe, behind them. And I don't even know what was on her mind, but the conversation turned out that I'm taking the [twins] to my place. She says no, you're not, I believe. Again, I'm — verbatim, I can't say, but there was some resistance to the fact that I was taking the [twins]."

Dutcher instructed one of the twins to close the car door, but defendant prevented it, and when he slowly drove the car away, defendant jumped into the car. Defendant said to her father: "I'm going to call the police because you hit and run me." Dutcher drove to his home, a distance of about a quarter of a mile.

Once home, Dutcher solicited the assistance of another of his daughters, who lived close by, "no more than 20 feet away," and then Tracy arrived. Dutcher said, "I believe she got wind of the disturbance."

Next, Dutcher called the police. As he explained it: "Because we went through with the threat to call the police about the hit and run accusation, and [Officer James Moore] showed up on the scene. And — well, after the real cause for the incident came to for, I showed him the paperwork — well, actually the one — the court orders of which I believe authorized me to be in my position as substitute caregiver." When the police officer spoke with defendant, she told him she was supposed to have the twins because their father was out of the country.

At trial, Tracy explained she was in El Segundo at work when she received a phone call from one of the twins who said defendant "is at the grandfather and his aunt's home stating that she's not going to let them go." The twin asked Tracy to come

4

retrieve them, and to stay on the phone until she got there. When Tracy arrived at the scene, the group was in defendant's sister's home. Defendant told her to "get away, you're trying to break in."

Based on the paperwork he had been shown, Officer Moore told defendant that it was not her day to visit the twins. On January 1, the next day, defendant was due to have the twins. Tracy took the twins to the police station and they went with defendant.

Defendant told the twins she was going to take them "somewhere fun." The twins expected to be delivered back to Tracy later that day, but defendant took them to Arizona. One of the twins texted defendant's license plate number of her car to Tracy. They did not see Tracy again for "about another week," missing three days of school. They were in Arizona for four or five days, and then in other places, one of which was Joshua Tree. The twins kept in contact with Tracy by text.

At one point, they were in a mall and the police showed up. The twins were taken to a police station. A police officer asked the twins where they wanted to be at that time, and they said they wanted to go to school. Defendant told police she had taken the children to Phoenix, Arizona. According to a detective, defendant "agreed and understood that she was not supposed to take the children out of the state."

Defendant was asked why she did not bring the children back on January 1, and defendant replied that she had custody of them. Defendant said she had documents in her vehicle showing she had shared custody. With defendant's permission, an officer retrieved a stack of documents from defendant's car, brought them to her and asked her to point to the document which stated she had custody. Defendant directed the officer to a 2006 court order. However, the officer already had a 2012 court order, which Tracy had provided earlier, and showed the current order to defendant and confirmed defendant had been in court the day the order was made. The officer admonished defendant more than

5

once that she could not take the children in the way she did, and that she had a right to go to court to get a different order.

Tracy came to the station and then took the twins to school. Defendant sent the twins a message: "I love you. I will pick you up after school." Thus, police were waiting at the twins' school that same day, January 9, "to prevent her from picking up the kids." One of the detectives had a voice mail message from defendant, about which the detective testified: "She identified herself in the voice mail and told me that she was at the [twins'] school and that she had seen Tracy Henry, the stepmother, and that she had called the police for a keep the peace type of situation."

When asked why she was there, defendant told police she was there to pick up the twins. A detective asked defendant, "what part of our earlier conversation" she didn't understand. Defendant continued to repeat she had custody and was there to pick up the children. Defendant was arrested.

Defendant testified she sent Henry an e-mail sometime in late November inquiring whether he was planning a trip to Jamaica, and that he wrote back "he was thinking of taking his mother back to Jamaica and that he wanted the [twins] to stay with Tracy and have my dad watch them some of the time." She said she had the first option to care, and explained that meant that when Henry was "unavailable for the custody — because he was gone for two weeks — then I would have the custody of the children."

On December 21, defendant filed a document in family court because she had not heard anything more from Henry and she wanted to talk about the trip "in front of the judge." In her court filing, she asked for "full custody, physical and legal" because Henry "has left the country." She was told there would be a court hearing on January 11. On cross-examination, defendant stated she knew her requests were denied pending the January 11 hearing.

6

With regard to the first option to care, defendant was asked by defense counsel questions about it during trial, and she answered as follows:

"Q. When we've been talking about this right of first option to care, is that what you were referring to when you would show it to people and talk about it?

"A. Yes.

"Q. What was your understanding of what that meant or still means?

"A. That means that if he is unavailable for the custody — because he was gone for two weeks — then I would have the custody of the children . . . .

[¶] . . . [¶]

"Q. Was it your understanding that this item, if it were to be used, would require any sort of emergency or exigency or problem with the other parent that they had to be gone for an extended period of time?

"A. For a period of time, yes.

"Q. But not that it has to be an emergency or anything else like that.

"A. Right. Right.

"Q. And this is the document that was agreed upon by both parties and signed off on when you ended your marriage?

"A. Yes. Uh-huh.

"Q. Each of these items was discussed with both parties at the time?

"A. Yes.

"Q. And this settlement done — Mr. Henry testified a little bit about it, but was this settlement done in court or in some other less-formal manner?

"A. I had hired a mediator to help us draft this up.

"Q. You've gone to family court multiple times since the end of your marriage, correct?

"A. Yes.

"Q. At any point that you gone to family court or been given anything from family court, have you ever seen anything from family court change or modify or end that provision 3.4?

"A. No.

"Q. Have you seen anything mention that provision 3.4?

"A. No.

"Q. Direct your attention to item 8l7 which reads 'Amendment/Revocation. This agreement may be amended or revoked only by a written agreement signed by the parties. This amended agreement or revocation will be enforceable without consideration.'

[¶] . . . [¶]

"Q. What was your understanding of that provision?

"A. We would have to agree to anything on that document if it was changed.

[¶] . . . [¶]

"Q. Any written changes to that right of first option to care?

"A. No.

"Q. When you are in family court, have you had an attorney?

"A. I have not.

"Q. Have you ever had an attorney in family court?

"A. Never."

## II

## DISCUSSION

Defendant contends the trial court "had a sua sponte duty to provide instruction on mistake of fact where there was substantial evidence that would negate the element of malice." Defendant's reasoning is that the court instructed the jury that

8

"someone acts maliciously when he or she intentionally does a wrongful act or when he or she acts with the intent to disturb, defraud, annoy or injure someone else," and that defendant "denied on the stand that she had any intention of vexing, et cetera." Therefore, according to defendant's argument, "there was an absence of circumstantial evidence to support a finding of malice based upon this avenue of proof." Consequently, defendant says the court should have instructed the jury on mistake of fact.

Respondent argues defendant forfeited this argument and that the court had no sua sponte duty to provide an instruction on mistake of fact because "that instruction conflicted with the defense argument that the 'first option to care' provision was good law." The Attorney General also contends any error was harmless.

When the court and counsel discussed instructions, the court inquired whether or not defense counsel had "any objections, comments, or suggestions to the court's proposed instructions." Defense counsel responded: "No, your Honor."

The instructions which were given by the court included several about the jury's duty to decide the facts. CALCRIM No. 226 included an admonishment that jurors "not automatically reject testimony just because of inconsistencies or conflicts." CALCRIM No. 251 instructed the jury about intent, stating "that person must not only intentionally commit the prohibited act, but must do so with a specific mental state." With regard to a conflict in the evidence, jurors were instructed to "decide what evidence, if any, to believe." As to the elements of the charged crime, jurors were told the People had to prove "the defendant acted maliciously" which means "she intentionally does a wrongful act or when . . . she acts with the unlawful intent to disturb, defraud, annoy, or injure someone else."

The court also told the jury: "A lawful custodian is a person, guardian or public agency that has a right to custody of the child. The right to custody means the

9

right to physical care, custody, and control of the child according to the law or because of a court order."

The instruction which was not given, CALCRIM No. 3406, and about which defendant now claims error, states: "The defendant is not guilty of _____<insert crime[s]> if (he/she) did not have the intent or mental state required to commit the crime because (he/she) [reasonably] did not know a fact or [reasonably and] mistakenly believed a fact. [¶] If the defendant's conduct would have been lawful under the facts as (he/she) [reasonably] believed them to be, (he/she) did not commit _____ <insert crime[s]>. [¶] If you find that the defendant believed that _____ <insert alleged mistaken facts> [and if you find that belief was reasonable], (he/she) did not have the specific intent or mental state required for _____ <insert crime[s]>. [¶] If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for _____ <insert crime[s]>, you must find (him/her) not guilty of (that crime/those crimes)."

""""It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citation.]""" (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) The obligation to instruct on a defense such as mistake of fact arises "'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense, and the defense is not inconsistent with the defendant's theory of the case.'" (*People v. Barton* (1995) 12 Cal.4th 186, 195.) With specific intent crimes, the instruction is only appropriate where the evidence supports a reasonable inference that the claimed mistake was made in good faith, even if unreasonable. (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1427.)

In *People v. Russell*, *supra*, 144 Cal.App.4th 1415, the defendant's primary defense was that he did not know the motorcycle was stolen because he believed it had

10

been abandoned, and defense counsel did not request mistake of fact or claim-of-right instructions. The appellate court stated, "the trial court had a sua sponte duty to instruct on both of these defenses if it appeared defendant was relying on the defenses, or if there was substantial evidence supportive of the defenses . . . ." (*Id.* at p. 1431.)

"All persons are capable of committing crimes except those belonging to the following classes: [¶] . . . [¶] Three — Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent." (Pen. Code, § 26.) "''''At common law an honest and reasonable belief in the existence of circumstances, which, if true, would make the act for which the person is indicted an innocent act, has always been held to be a good defense. . . . [I]t has never been suggested that these exceptions do not equally apply to the case of statutory offenses unless they are excluded expressly or by necessary implication.'''" [Citation.]" (*In re Jennings* (2004) 34 Cal.4th 254, 279.) "The mistake-of-fact defense operates to negate the requisite criminal intent or mens rea element of the crime, but applies only in limited circumstances, specifically when the defendant holds a mistaken belief in a fact or set of circumstance which, if existent or true, would render the defendant's otherwise criminal conduct lawful. [Citations.]" (*People v. Lawson* (2013) 215 Cal.App.4th 108, 111.) "[E]ven if there had been sufficient evidence to support an instruction on the defense of mistake of fact, the trial court did not have a duty to instruct on the defense sua sponte, or on any other defense that served only to negate the intent element of the charged crime . . . ." (*Id.* at pp. 111-112. )

"'A mistake of fact is where a person understands the facts to be other than they are; whereas a mistake of law is where a person knows the facts as they really are, but has a mistaken belief as to the legal consequences of those facts.'" (*People v. Kelly* (1939) 35 Cal.App.2d 571, 574.) "'While a mistake of fact usually is a defense, a mistake of law usually is not. It is commonly said that ignorance of the law is no

11

excuse.'" (*People v. Zamani* (2010) 183 Cal.App.4th 854, 887.) Nonetheless, a mistake of law is a defense where the mistake negates the specific intent required for the crime. (*People v. Vineberg* (1981) 125 Cal.App.3d 127, 137.) "In cases of violation of child custody orders, the specific intent required for the crime is the intent to deprive another person of that person's right to custody or visitation. [Citation.] However, a mistake of law instruction is only appropriate where the evidence supports a reasonable inference that the claimed mistake was held in good faith. [Citation.]" (*People v. Flora* (1991) 228 Cal.App.3d 662, 669.) Here, defendant knew about the many court orders issued for years after the 2006 settlement agreement, and if she was mistaken at all, it was a mistake of legal consequences to know facts. In other words, any mistake here was a mistake of law and not a mistake of fact.

Defendant was well aware Henry had physical and legal custody of the twins; otherwise, she would not have gone to family court on December 21 to try to attempt to take custody away from Henry; on cross-examination, she admitted she was told that day her request was denied pending a hearing. At every step, law enforcement officers advised her she did not have custody and that it was not her time for visitation. On December 31, during the scene at Dutcher's home, defendant owned up to the police officer that she was present in court when Henry was given custody of the children. On January 9, the day the children were found at a mall, defendant told a detective she "understood that she was not supposed to take the children out of the state." Under the circumstances we find in this record, we cannot conclude there was substantial evidence, or that a reasonable juror could have reasonably found, that defendant labored under a good faith mistake of fact or mistake of law, or that the trial court erred in instructing the jury. Any error by the trial court, and we do not find there was any error, in not instructing sua sponte is harmless under any standard of review. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

12

III

DISPOSITION

The judgment is affirmed.


                                    MOORE, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.

13