[Crim. No. 42073. Second Dist., Div. One. Nov. 16, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
RICCI E. LORTZ, Defendant and Appellant.

COUNSEL

Thomas G. McBride, Sr., for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Gregory W. Alarcon, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**LILLIE, Acting P. J.**—Having waived a jury trial and by stipulation submitted the cause on the transcript of the testimony taken at the preliminary hearing, defendant was found guilty of child stealing in violation of section 278.5, subdivision (a), Penal Code, as charged in the information. He appeals from the judgment.

Robert was born to Donna Cain and defendant on August 31, 1979; they lived together until Robert was seven months old; after separation the mother filed a petition in superior court,[1] and an interlocutory judgment giving the parents joint custody of Robert was entered December 5, 1980. On April 20, 1981, the parties personally appeared before Commissioner Ragins of the family law court and pursuant to their oral agreement the interlocutory judgment was modified by order of the court reflected in the minute order of April 20, 1981, as follows: "Custody of the minor child, Robert Thomas Lortz, (born 8-31-79) is awarded to the Respondent [Defendant]. The right of reasonable visitation is reserved to Petitioner [mother]. Custody shall change to the Peti-

---

[1] The parties entered into an invalid marriage and apparently Donna Cain filed a petition for dissolution primarily to resolve the issue of custody of Robert and visitation rights.

tioner on 9-1-81 if the Petitioner has a place of her own away from her mother and sister. At that time reasonable visitation shall be awarded to the Respondent. Custody shall then change every four months thereafter until further order of the court. [¶] (X) Visitation shall be 1 day per week from 10AM through 7PM, with two day notice required, plus 1 evening per week for two hours.'' There followed two additional provisions each designated (X) relating to matters not here material. Thereafter as per the April 20, 1981, order the mother saw the baby on a regular basis. Several weeks later defendant and she orally agreed that she would have visitation with Robert every Saturday from 10 a.m. through 7 p.m. and every Wednesday from 5 p.m. through 7 p.m.

The baby lived with defendant and defendant's mother, Mrs. Lortz, at the latter's residence, and the mother usually visited the baby there. She continued to see him regularly until Wednesday, June 17, 1981. On that day, as instructed, the mother went to the residence of defendant's grandmother, Mrs. McCoy, for her regular visitation with Robert but was told by her that the baby was not there and she did not know if he would be back. The day before (June 16, 1981), the mother had found out through defendant's brother who "talked to my sister about it" that defendant was going to take the baby away; she became concerned, drove past the grandmother's residence and saw her baby in the front yard "but the next day, he [Robert] was gone." Thereafter five or six times the mother called Mrs. Lortz but she "just repeatedly said he wasn't there, the baby wasn't there; they were just gone." The mother was not told where the baby was taken or if he would be returned; she received no communication or telephone call from defendant regarding the baby, and to the time of trial she had not seen Robert. Although defendant returned from Ohio surrendering himself on November 2, 1981, the baby's whereabouts were still unknown to the mother.

According to Mrs. Lortz, defendant and the baby lived with her and they left her home permanently. The preliminary hearing was on November 13, 1981; about two weeks before that Mrs. Lortz received a telephone call from defendant in Ohio and she "guesses" he told her he had Robert with him. Meanwhile an arrest warrant for defendant was issued; on November 2, 1981, he surrendered. On the Friday (Nov. 7, 1981) before the preliminary hearing, Mrs. Lortz went to Ohio and saw the baby there.

Section 278.5 Penal Code in pertinent part provides: "(a) Every person who in violation of a custody decree takes, retains after the expiration of a visitation period, or conceals the child from his legal custodian, and every person who has custody of a child pursuant to an order, judgment or decree of any court which grants another person rights to custody or visitation of such child, and who detains or conceals such child with the intent to deprive the other person of such right to custody or visitation shall be punished . . . ."

## A

### PROBABLE CAUSE

Three police reports setting forth background information for issuance of the arrest warrant for defendant, obtained at the behest of the mother and Mr. Gordon, her lawyer, were received in evidence as defendant's exhibit B. As a result of the issuance of the warrant, defendant later surrendered. Appellant asserts that Mr. Gordon misrepresented to police that the custody order provided the child could not be removed from the state without permission of the court, and "tricked" the officer into believing that a violation of the visitation order had occurred, thus there was no probable cause for his arrest.

■ Our examination of the police reports convinces us there was ample probable cause for defendant's arrest (*People* v. *Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632]) and that the warrant based thereon was proper, but we deem the validity of defendant's arrest here to be immaterial because no evidence obtained as a result of the arrest was offered or received at trial. (*People* v. *Combes* (1961) 56 Cal.2d 135, 146 [14 Cal.Rptr. 4, 363 P.2d 4].) Under these circumstances the claimed illegality of his arrest offers appellant no ground on which to attack his conviction. (*People* v. *Marsh* (1962) 58 Cal.2d 732, 746-747 [26 Cal.Rptr. 300, 376 P.2d 300].) It has long been established that a defendant who has been subjected to illegal arrest should not by virtue of such illegality gain immunity from punishment for the offense for which he was arrested. There is no statutory authorization for reversal on the grounds of illegality of arrest of a defendant and we know of no decision by any court of appellate jurisdiction in this state which holds that "when a defendant is illegally arrested for a public offense the illegality of the arrest permeates subsequent proceedings by which he is formally charged with the offense and tried on the formal charge." (*People* v. *Valenti* (1957) 49 Cal.2d 199, 203 [316 P.2d 633].)

## B

■ Although stated in varying ways, the remaining five contentions are based upon the same false premise that before a felony child kidnaping charge can be filed under section 278.5, subdivision (a), Penal Code, there must be a judicial finding by the family law court that the custodial parent has violated the custody or visitation order, and a "police officer in the street should not decide the visitation has been violated, in order to file" such a charge.

■ It is a preposterous argument that all the mother was awarded by the court's order of April 20, 1981, was "reasonable visitation," a term so vague that only a family law court could determine what is "reasonable" thus there

could be no violation of the order. Appellant completely ignores the first paragraph (X) of the minute order specifically defining reasonable visitation not only for the mother but for defendant in the event custody of Robert changed to the mother on September 1, 1981. But until such change of custody paragraph (X) clearly refers to the reasonable visitation reserved to the mother defining it as one day per week from 10 a.m. through 7 p.m. and one evening a week for two hours. Any contention that defendant did not know or understand the meaning of "reasonable visitation" as defined in the minute order is ludicrous when viewed in light of (1) the fact that before Commissioner Ragins made his order on April 20, 1981, defendant and the mother orally agreed to the custody change and the number of days per week and hours of visitation; (2) the presence of both parties in open court at the time the order was made; (3) the plain language of the minute order which incorporated the oral agreement of the parties; (4) defendant's subsequent compliance with the terms of the minute order; (5) defendant's later oral agreement with the mother specifically establishing that the mother's visitation days would be every Saturday (10 a.m. to 7 p.m.) and every Wednesday (5 p.m. to 7 p.m.); and (6) defendant's regular compliance with this agreement until June 17, 1981, when he absconded with Robert. It appears that the only person in this case who claims he does not understand the meaning of the minute order of April 20, 1981, is appellant's counsel. Even defendant did not testify he did not understand the order.

I

■ Section 278.5 subdivision (a), Penal Code, was enacted in 1976. The purpose of the legislation was to aid California courts in attempting "to protect children from the extralegal hazards of custody disputes" and "reduce the possibility that desperate parents will take the law into their own hands." (Foster and Freed, *Child Snatching and Custodial Fights: The Case for the Uniform Child Custody Jurisdiction Act* (1977) 28 Hastings L.J. 1011, 1017.) This statute not only provides a better means of locating and returning abducted children to the person or persons entitled to custody (see subd. (b)) but makes the criminal sanctions for conduct proscribed in subdivision (a) more clear. (*Domestic Relations* (1977) 8 Pacific L.J. 315, 317-318.) The statute was enacted to encourage parents who are unhappy with custody or visitation provisions under existing conditions to return to the civil court to seek judicial clarification or modification of the order, and to discourage them from taking the law into their own hands by concealing the child in a place unknown to the other parent. Here defendant did not seek a modification or clarification of the visitation order if in fact he did not understand it or was dissatisfied with its provisions, nor did he appeal therefrom. Instead he absconded with the baby concealing him from the mother four and one-half months.

■ We conclude it was not necessary for the mother to first obtain a judicial finding by the family law court that the visitation order had been

violated by defendant before a criminal charge could be filed against him. First, section 278.5 subdivision (a), Penal Code, does not provide for such judicial finding and had the Legislature so intended it would have so stated. Second, in that portion of section 278.5, subdivision (a) under which defendant was charged, there is not even a requirement that there be a violation of an order. Defendant, who had legal custody of the baby under the custody decree, was not nor could he be charged under the first portion of section 278.5, subdivision (a) that requires a "violation of custody decree," but under the second part of subdivision (a) which contains no such language. Although it could be argued that inherent in the custodial parent's concealment of a child with the intent to deprive the noncustodial parent of her right of visitation is a violation of the visitation order, the Legislature did not see fit to make such violation an element of the crime punishable under the second portion of subdivision (a). Third, if it were necessary for the noncustodial parent to go through a separate civil proceeding in the family law court to obtain a judicial finding of violation of a visitation order in order to obtain intervention of law enforcement, it would defeat the entire purpose of this special legislation. The delay inherent in the time-consuming procedure of locating the absconding parent and serving him with civil process for a family law court hearing could only encourage him to ignore the process, move the child from place to place and keep one step ahead of the process server. Fourth, the pure purpose of the statute is to provide for criminal sanctions for violations of custody and visitation orders. While it also provides for specific relief for the return of the child to the person having lawful charge of him and assessment of the costs incurred therein against any defendant convicted under this section (subd. (b)), the criminal sanctions were intended to be in addition to the civil contempt and modification already provided for under family law.

As stated by the trial court in finding defendant guilty, "It would appear that once the child was taken out of the state and where there is an indication that there was a deliberate withholding of visitation rights either by absence from the state or by failure to notify of the address, that there is prima facie violation of the statute."

II

■ Appellant's brief contention that section 278.5, subdivision (a) is rendered "void for vagueness" in that it fails to place the custodial parent on sufficient notice as to the type of conduct required of him and results in allowing lay police officers and combating lawyers rather than the family law court to determine there was a violation of the custody order,[2] is without merit.

---

[2]Again appellant points to asserted vagueness in the minute order of April 20, 1981, this time even questioning whether the language set off by the asterisk at the bottom of the minute.order implies some sort of specific visitation. It appears that because there was not sufficient room on

"[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." (*Connally* v. *General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].) However, "[a] statute is fatally vague only when it exposes a potential actor to some risk or detriment without giving him fair warning of the nature of the proscribed conduct." (*Rowan* v. *Post Office Dept.* (1970) 397 U.S. 728, 740 [25 L.Ed.2d 736, 745, 90 S.Ct. 1484].) Defendant knew that the "right of reasonable visitation" reserved to Robert's mother meant she could see the baby on Wednesday evenings for two hours and on Saturdays for nine hours, and knew that by concealing the baby from the mother at a location unknown to her, he was violating her right to visitation. He kept the baby away from the mother's ability to visit him—at an undisclosed place—for four and one-half months without communicating with or in any manner advising the mother of Robert's whereabouts and left the baby in Ohio when he returned to California to surrender himself.

### III

Also without merit is appellant's contention that the application of section 278.5, subdivision (a) violates his Fifth and Fourteenth Amendment due process right because without a prior judicial finding by the family law court of a violation of the visitation order the statute fails to incorporate "notions of fair notice or warning of the type of conduct required of [him]."

In *Roth* v. *United States* (1957) 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304] it was argued that an obscenity statute did not provide reasonable ascertainable standards of guilt and therefore violated the constitutional requirements of due process. Said the court at pages 491-492 [1 L.Ed.2d at pages 1510-1511]: "This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. '. . . [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. . . .' [Citation.]" For all of the reasons heretofore mentioned, it is difficult to comprehend appellant's argument that he and his counsel believed he was in full compliance with the visitation order. Defendant well knew and understood the provisions of the minute order of April 20, 1981, and regularly complied with them until he took the baby out of the state on June 17. Defendant's absence from the state with the baby for over four months, his failure to notify the mother of the whereabouts

---

the printed form of the minute order for the order of the court modifying the interlocutory judgment, the clerk typed a continuation of the order in the space at the bottom of the printed form, and to indicate that it in fact was a continuation, used the asterisk; and paragraph (X) specifically defines visitation for the noncustodial parent.

of the baby and the fact he returned to California without him clearly support the conclusion that defendant was on notice of the conduct required by the statute and that he voluntarily chose to violate section 278.5, subdivision (a).

### IV

Appellant claims he had a legal right (§ 213, Civ. Code) to permanently take the baby out of state reiterating the argument that if it was unreasonable for him to change his residence then this was for a family law court to decide not the police. Whether defendant had a right to choose the residence of his child is beside the point for the issue is whether he concealed the baby with intent to deprive the mother of her right to visitation.

### V

Finally, appellant argues that the trial court erred in finding that he acted with the specific intent required by section 278.5, subdivision (a) supported only by recitation of part of a lengthy argument made by *his* counsel to the court below, and a comment by the trial court. After reviewing the entire record it is clear to us that each judge who handled the case, and everyone else connected with it including defendant understood the order for visitation and had no problem interpreting it; the only one who seems to have had any trouble in this regard is appellant's counsel. The comment of the trial court to which appellant wishes to attach the implication that the court felt the order was unclear, was a comment made *after* the court sentenced defendant giving him probation. In order to avoid any future violation of probation which defendant might seek to justify on the ground that he did not understand the order, the court suggested that if defendant does not understand the order he had better seek an order "clearly readable by both parties" so there would be no future violation. As to the specific intent to deprive the mother of her right to visitation, the trial court found "from the conduct of the defendant in this case that the element of specific intent is satisfied beyond a reasonable doubt, there being no other satisfactory explanation given." The evidence amply supports such finding. On June 16, 1981, the mother learned defendant intended to take the baby out of the state and not return; on June 17, 1981, when she arrived for her regular visit with Robert "he was gone"; Mrs. Lortz told her she had packed the baby's things and made a bed for him in the car, defendant was going fishing and she gave him $100 in case the car broke down; the mother knew that on the previous day defendant had the car repaired. This obviously was a subterfuge used by Mrs. Lortz and defendant to permit defendant to surreptitiously leave the state with the baby without interference. Thereafter Mrs. Lortz only said "they were just gone"; a real estate agent told the mother that the Lortz' house was up for sale and the family had left the state, and it appeared they had moved, a fact later confirmed by police. Actually Mrs. Lortz had not left the

state but was not available to the mother. As of November 7, 1981, the baby was in Ohio because Mrs. Lortz went there to visit him, defendant having five days before (Nov. 2), returned to California to surrender himself; he did not bring the baby with him. Defendant took Robert from his place of residence on June 17, 1981, and kept him from the mother for four and one-half months in a place unknown to her without leaving word as to where he had gone, how he could be contacted or for how long he would be away with the baby or whether he would ever return Robert; she received no telephone call or communication from defendant. Whether defendant took the baby to Ohio on June 17 or later is of little significance because he concealed the child from the mother and detained him at a place beyond her ability to see him; at least part of that time the baby was in Ohio outside of the jurisdiction of the court. Up to the time of trial the mother had not seen the baby and was not told the exact location of the child. We agree with the trial court that defendant's conduct established the specific intent requirement of the statute.

The judgment is affirmed.

Dalsimer, J., and Byrne, J.,* concurred.

A petition for a rehearing was denied December 15, 1982, and appellant's petition for a rehearing by the Supreme Court was denied January 12, 1983.

*Assigned by the Chairperson of the Judicial Council.