[Crim. No. 23091. Sept. 13, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
GENE MARTIN HOWARD, Defendant and Appellant.

COUNSEL

Philip Schmidt for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield, Keith I. Motley and M. Howard Wayne, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BIRD, C. J.—Does a reconciliation by a husband and wife cancel a child custody order which had been granted as part of an interlocutory decree of dissolution?

I.

In July 1978, after six years of marriage, Gene and Pamela Howard obtained an interlocutory judgment of dissolution, which gave Pamela custody of the couple's two children. Gene was given visitation rights under the decree.

One month later, Gene moved back in with Pamela and their two children, and continued living with them for almost two years. During this period, Pamela and Gene resumed marital relations, and signed rental, checking and credit agreements as husband and wife. Also during this time, neither party attempted to enforce the provisions of the interlocutory decree, which, inter alia, called for the division of community property and Gene's payment of child support to Pamela.

In June 1980, Gene went to Colorado and stayed for several weeks. He testified that he went to attend his brother's funeral and to be with his ailing

father. Pamela believed that Gene's departure reflected the couple's final split-up.

Sometime in July 1980, Gene telephoned Pamela and threatened to take the children without her permission. That same month, Pamela signed a request for a final judgment of dissolution[1] which declared that "since entry of the interlocutory judgment, the parties have not become reconciled . . . ."[2]

Gene felt that Pamela was neglecting the children.[3] Accordingly, he returned to California. On August 5, 1980, Gene told the children's babysitter that he wanted to take the children out for an hour or two. Instead, he returned with them to Colorado. While in Colorado, he refused to answer Pamela's calls or to allow the children to call her.

Pamela notified the police. A month and a half later, Gene was arrested and charged with one count of child stealing, and was returned to California. He pled not guilty and was subsequently convicted by a jury of violating Penal Code section 278.5.[4] Imposition of sentence was suspended and Gene was placed on probation for three years on the condition that he serve thirty days in county jail. This appeal followed.

Gene presents two contentions on appeal. First, he argues that the trial court erred in failing to instruct the jury with respect to reconciliation.[5] As the basis for his argument, Gene contends that since he and Pamela had reconciled after the entry of the interlocutory decree, the decree and accom-

---

[1]Pamela signed the request on July 14, 1980, and it was filed two weeks later. Pamela testified that by the time of trial, the dissolution was final. The record, however, does not indicate when the final judgment of dissolution was actually entered.

[2]At Gene's trial, Pamela first testified that in the declaration for the final judgment of dissolution, she stated that she and Gene had not reconciled. On cross-examination, she admitted that that declaration was not true.

[3]Gene's mother, who lived across the street from Pamela, had told Gene that Pamela was not properly caring for the children in that she would leave them alone in the house at various times without supervision.

At the time of these events, the children were four and seven years old.

[4]Gene was convicted of violating the 1976 version of section 278.5. (Stats. 1976, ch. 1399, § 11, p. 6315.) That statute was amended in 1983. (Stats. 1983, ch. 990, § 4, p. —.) All further references to section 278.5 are to the 1976 version.

All statutory references are to the Penal Code unless otherwise noted.

[5]At the conclusion of the trial, the defense requested an instruction on reconciliation. The proposed instruction read: "A husband and wife who are separated have reconciled when the facts show that they intended to reconcile. If reconciliation has occurred the duration of the reconciliation is of no consequence and it is irrelevant that the parties separate again."

The trial court refused to give this instruction and instead instructed the jury that "[t]he validity or invalidity of the court order . . . is not for your determination and must not enter into your deliberations in any way."

panying child custody order were no longer in effect. Without a valid decree, he could not have taken the children "in violation of a custody decree" as required by section 278.5.

Second, he asserts that the trial court erred in failing to give instructions involving a good faith mistake of law.[6] Gene maintains that even if the child custody decree was still in effect, he should not be held criminally liable because he possessed a good faith but mistaken belief that the couple had reconciled, thereby nullifying the child custody order. Since appellant's first claim is meritorious, his second contention need not be addressed.

## II.

Section 278.5, subdivision (a) provided in pertinent part: "Every person who *in violation of a custody decree* takes, retains after the expiration of a visitation period, or conceals the child from his legal custodian, and every person who has custody of a child pursuant to an order, judgment or decree of any court which grants another person rights to custody or visitation of such child, and who detains or conceals such child with the intent to deprive the other person of such right to custody or visitation shall be punished by imprisonment in the state prison . . . ." (Italics added.)

■ The statute clearly required that there exist an order regarding custody rights. This court must therefore determine whether a child custody order was in effect at the time Gene took the children.[7] To answer that question this court must decide whether a reconciliation by a husband and wife cancels a child custody order granted as part of an interlocutory decree of dissolution.

■ It is firmly established that " '[w]hen parties become reconciled after an interlocutory decree and live together as husband and wife, the

---

[6]The defense requested that the trial court give CALJIC No. 4.35, fourth edition 1979. That instruction provides: "An act committed or an omission made under an ignorance or mistake of fact which disproves any criminal intent is not a crime. [¶] Thus a person is not guilty of a crime if he commits an act or omits to act under an honest and reasonable belief in the existence of certain facts and circumstances which, if true, would make such act or omission lawful."

Although CALJIC No. 4.35 is entitled "Ignorance or Mistake of Fact," the trial court wrote on the face of the requested instruction "mistake of law denied."

[7]Without a custody decree in effect, both parents are equally entitled to custody of an unmarried minor. (See Civ. Code, § 197.) In addition, this court has stated that " '[i]n the absence of an order or decree affecting the custody of a child, it is generally held that a parent . . . does not commit the crime of kidnapping by taking exclusive possession of the child.' [Citations.]" (*Wilborn* v. *Superior Court* (1959) 51 Cal.2d 828, 830 [337 P.2d 65].) A similar conclusion obtains as to the crime of child stealing. (See *Cline* v. *Superior Court* (1982) 135 Cal.App.3d 943, 947 [185 Cal.Rptr. 787].)

right to a final decree is destroyed [citations], and *they are entitled to such rights as arise from the legal relation of husband and wife.*' [Citations.]" (*In re Marriage of Modnick* (1983) 33 Cal.3d 897, 911 [191 Cal.Rptr. 629, 663 P.2d 187], italics added.) The italicized language suggests that reconciliation restores each spouse to his or her full parental, as well as marital, rights—including the right to custody of the children. (See *ante,* fn. 7.)

Although the reconciliation issue has arisen in a variety of contexts,[8] there does not appear to be any decision involving the question as to whether a custody order which is part of an interlocutory decree retains vitality after the parents have reconciled. ■ However, in the related context of spousal support, "[r]econciliation and a resumption of marital relations cancel the executory provisions of a property settlement agreement." (*Harrold* v. *Harrold* (1950) 100 Cal.App.2d 601, 609 [224 P.2d 66]; *Tompkins* v. *Tompkins, supra,* 202 Cal.App.2d at pp. 59-60; *Purdy* v. *Purdy* (1956) 138 Cal.App.2d 402, 405 [291 P.2d 1005]; *Morgan* v. *Morgan* (1951) 106 Cal.App.2d 189, 192 [234 P.2d 782]; *Peters* v. *Peters* (1936) 16 Cal.App.2d 383, 386-387 [60 P.2d 313]; see also *Cochran* v. *Cochran* (1970) 13 Cal.App.3d 339, 349 [91 Cal.Rptr. 630] ["'a bona fide reconciliation render[s] the restrictions in the interlocutory judgment nugatory . . . .'"].) Under this reasoning, a reconciliation would cancel a child custody order granted as part of an interlocutory judgment.

This result is in harmony with the concept of reconciliation. ■ In *In re Marriage of Modnick, supra,* 33 Cal.3d 897, this court observed that to determine if there has been a reconciliation, one "considers only the intent of the parties to permanently reunite as husband and wife." (*Id.,* at p. 912, fn. 14.) "[T]he party asserting the fact of reconciliation . . . must establish by 'clear and cogent proof' that the spouses mutually intended to resume their marital status and to live together on a permanent basis. . . . [¶] The intention to reunite must be unconditional and contemplate a complete restoration of all marital rights." (*Id.,* at p. 911.)

■ When the parties have reconciled within the meaning of *Modnick,* they have decided to resume their marriage, and the interlocutory decree no

---

[8]See, e.g., *Nelson* v. *Nelson* (1936) 7 Cal.2d 449 [60 P.2d 982] (reconciliation bars entry of final judgment after subsequent separation; parties who have reconciled retain their status as husband and wife and are liable for the support of children conceived after the reconciliation); *Estate of Abila* (1948) 32 Cal.2d 559 [197 P.2d 10] (reconciliation permits spouse to claim inheritance rights); *Estate of Edwards* (1972) 25 Cal.App.3d 906, 912-913 [102 Cal.Rptr. 216] (same); *Rickards* v. *Noonan* (1940) 40 Cal.App.2d 266 [104 P.2d 839] (reconciliation allows surviving spouse to obtain full wrongful death damages despite absence of support provision in interlocutory decree); *Tompkins* v. *Tompkins* (1962) 202 Cal.App.2d 55, 59-63 [20 Cal.Rptr. 530] (reconciliation permits wife to bring new divorce action, free of the restrictions of prior interlocutory decree).

longer governs.[9] Thus, upon reconciliation the general rights and obligations of the marital relationship become effective once again. (*Modnick, supra,* 33 Cal.3d at p. 911.) As one out-of-state authority explained: "Itwould [*sic*] be a hard rule to hold that where the parties resume the marital relationship after entry of the interlocutory decree, that regardless of how happy the parties may have been for six months, one, two or three years, that one party could hold the interlocuory [*sic*] decree over the head of the other and demand that the line be toed." (*Lund* v. *Lund* (1957)· 6 Utah 2d 425, 427 [315 P.2d 856, 858]; accord *Thomas* v. *Thomas* (1982) 294 Md. 605 [451 A.2d 1215, 1223].)

Apply this analysis to the custody setting and it becomes clear that an order for child custody, like other aspects of the interlocutory decree, is cancelled when the parties effect a reconciliation before a final judgment of dissolution is entered.

The evidence introduced at trial established that Gene and Pamela had reconciled as a matter of law. Both testified that they had reconciled after the interlocutory decree was entered. They lived together as husband and wife for almost two years after the decree was issued. During this period, Pamela and Gene held themselves out as husband and wife, signing a rental agreement, maintaining a joint checking account, purchasing a bed on credit, signing contracts, engaging in sexual relations, and sharing the responsibility of raising their two children. Neither took any steps to enforce the provisions of the interlocutory decree. Clearly, Gene and Pamela "mutually intended to resume their marital status and to live together on a permanent basis. . . . [¶] [Their] intention to reunite [was] unconditional and contemplate[d] a complete restoration of all marital rights." (*Modnick, supra,* 33 Cal.3d at p. 911.)[10]

---

[9]As a number of decisions have explained: "One of the great purposes of the law enforcing a . . . delay between the interlocutory and final decrees of divorce is to provide a period during which the parties may become reconciled and thus avoid the unhappy consequence of a final decree of divorce. . . . It has been declared that one of the important purposes of the law is to give the spouses a chance to effect a reconciliation, which the law always favors." (*Rickards* v. *Noonan, supra,* 40 Cal.App.2d at p. 274; see, e.g., *Olson* v. *Superior Court* (1917) 175 Cal. 250, 252 [165 P. 706, 1 A.L.R. 1589].)

[10]The dissent asserts that there was only an "attempted reconciliation" and implies that Gene and Pamela merely cohabitated after the interlocutory decree was filed. (See *post,* at p. 864.)

The facts are to the contrary. Apart from all the indicia of reconciliation—from the couple's buying a waterbed to their holding themselves out as husband and wife—there is Pamela's testimony that: (1) things "worked out" sometimes; (2) she and Gene had resolved their differences; (3) she told others that she and Gene had reconciled; and (4) her signed declaration, stating that she and Gene had not reconciled, was false. This indicates a clear intent to "resume [the] marital status and to live together on a permanent basis." (*Modnick, supra,* 33 Cal.3d at p. 911.)

The fact that the reconciliation failed is irrelevant. "If . . . a reconciliation has occurred

■ Since Gene and Pamela reconciled before a final judgment of dissolution was entered, the child custody order which had been granted as part of the interlocutory decree was cancelled. Thus, the state failed to establish one of the essential elements of section 278.5—an existing child custody order. This failure alone requires reversal.

However, a general reversal is not an adequate remedy since a retrial would place appellant in jeopardy once again. (§ 1262.) Having once failed to establish all of the requisite elements of a section 278.5 charge, the prosecution is barred by the double jeopardy clause from retrying appellant. (*Burks* v. *United States* (1978) 437 U.S. 1, 11, 18 [57 L.Ed.2d 1, 9, 14, 98 S.Ct. 2141]; *People* v. *Green* (1980) 27 Cal.3d 1, 62 [164 Cal.Rptr. 1, 609 P.2d 468]; see also *People* v. *Belton* (1979) 23 Cal.3d 516, 527 [153 Cal.Rptr. 195, 591 P.2d 485].)

Accordingly, the judgment of conviction is reversed.

Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**BIRD, C. J.**—I concur. I write separately to address an important issue which was the original reason why this court granted a hearing in this case. The issue is whether an accused's honest, good faith, but mistaken belief that there has been a reconciliation is a defense to a violation of Penal Code section 278.5.[1] Resolution of this question turns on whether section 278.5, subdivision (a) describes a specific intent crime and if it does, what specific intent is required.

Section 278.5, subdivision (a) provided in pertinent part: "Every person who in violation of a custody decree takes, retains after the expiration of a visitation period, or conceals the child from his legal custodian, and every person who has custody of a child pursuant to an order, judgment or decree of any court which grants another person rights to custody or visitation of such child, and who detains or conceals such child *with the intent to deprive the other person of such right to custody or visitation* shall be punished by

. . . the duration of the reconciliation is of no consequence, nor is it relevant that the parties again split up." (*Nacht* v. *Nacht* (1959) 167 Cal.App.2d 254, 261 [334 P.2d 275].)

The dissent also concludes that the jury accepted Pamela's "depiction of the events" as to the reconciliation (*post*, at p. 865), and "did not buy defendant's story that he believed there had been a reconciliation that wiped out the previous order . . . ." (*Post*, at p. 866.)

The trial court, however, refused to give the jury any instructions on the question as to whether there had been a reconciliation. (*Ante*, fn. 5.) Thus, the jury never made any determination as to the reconciliation.

[1]All statutory references are to the Penal Code unless otherwise indicated.

Appellant was convicted of violating the 1976 version of section 278.5 (Stats. 1976, ch. 1399, § 11, p. 6315.) That statute was amended in 1983. (Stats. 1983, ch. 990, § 4.) All further references to section 278.5 are to the 1976 version unless otherwise noted.

imprisonment in the state prison . . . ." (Italics added.) As is evident from the italicized language, the statute clearly contained a specific intent element. (See *People* v. *Lortz* (1982) 137 Cal.App.3d 363, 371-372 [187 Cal.Rptr. 89].)

The Attorney General recognizes the existence of this specific intent language, but would limit its applicability to persons who have custody.[2] In his view, section 278.5 described a general intent crime as to a "noncustodial parent,"[3] thereby rendering irrelevant that parent's otherwise unintentional mistakes.

However, such a constrained construction is illogical at best. Consider the following example. Under the terms of a custody decree, a mother had visitation rights on the first weekend of every month. Acting under the mistaken belief that she had been granted visitation rights on the *second* weekend of every month, she took her child on the second weekend instead of on the first. Under the Attorney General's view, the mother could be convicted of violating section 278.5, since she took her child in violation of a custody decree, even though she lacked the specific intent to deprive the father of his custody rights. Surely, the Legislature did not intend such a result.

The Attorney General's interpretation is also contrary to the legislative history and the statutory scheme of which section 278.5 was a part. Every other statute in this area contained a specific intent element.[4] For example,

---

[2]Section 278.5 applied to two classes of persons. The first part of subdivision (a) concerned persons who did not have custody pursuant to a custody decree but who did have some rights under the decree, such as visitation rights. (Hereafter, these persons are referred to as "noncustodial parents.") The second part concerned persons who were granted custody pursuant to a custody decree. (Hereafter, these individuals are referred to as "custodial parents.")

[3]Presumably, the Attorney General culls this general intent from the language in section 278.5 which punished "[e]very person who in violation of a custody decree takes, retains . . . or conceals the child . . . ."

[4]Former section 279 was divided into three subdivisions. Subdivision (a) prohibited the act of keeping a child after the expiration of a visitation period "without good cause and with intent to detain or conceal such child." Subdivision (b) forbade the act of concealing a child "without good cause and with intent to deprive such other person of such right of limited custody or visitation." Subdivision (c) proscribed removing and concealing a child "without good cause and with intent to prevent the other parent from exercising rights of custody to the child . . . ." (Stats. 1965, ch. 194, § 1, p. 1158, repealed by Stats. 1976, ch. 1399, § 12, p. 6316.)

An earlier version of section 278 provided in pertinent part: "Every person who maliciously, forcibly, or fraudulently takes or entices away any minor child with intent to detain and conceal such child from its parent, guardian, or other person having the lawful charge of such child is punishable . . . ." (Stats. 1901, ch. 106, § 1, p. 269, repealed by Stats. 1976, ch. 1399, § 9, p. 6315.)

an earlier version of section 278, subdivision (a)[5] provided in pertinent part: "Every person, not having a right of custody, who maliciously takes, entices away, detains or conceals any minor child with intent to detain or conceal such child from a parent, or guardian, or other person having the lawful charge of such child shall be punished by imprisonment in the state prison . . . ." Since this statute did not require a violation of a custody decree, it included situations in which a person without *any* rights under a custody decree took a child. Under this section, the state was required to prove the accused's specific intent to detain or conceal a child from his or her parent or guardian in addition to the act of taking the child. (See *People* v. *Johnson* (1984) 151 Cal.App.3d 1021, 1026 [199 Cal.Rptr. 231].)

Section 278.5, on the other hand, required a violation of a custody decree and, therefore, included situations in which a "noncustodial parent" with visitation rights took his or her child. Under the Attorney General's interpretation, in a section 278.5 prosecution involving a "noncustodial parent," the state would not have been required to prove any culpable mental element beyond a general "intent to take, retain, or conceal." It is unreasonable to conclude that the Legislature intended to make it *more* difficult to convict persons without any rights pursuant to a custody decree than to convict the child's own parent.

The legislative evolution of section 278.5 also supports the view that a specific intent is required in section 278.5 cases. As initially proposed by Assembly Bill No. 2549, section 278, subdivision (b)—which eventually was enacted as section 278.5, subdivision (a)—contained only the "custodial parent" portion with its specific intent requirement. (Assem. Bill No. 2549 (1975-1976 Reg. Sess.) Sept. 5, 1975.) Subsequent amendments added the "noncustodial parent" provision to the same subdivision. (Assem. Amend. to Assem. Bill No. 2549 (1975-1976 Reg. Sess.) Jan. 20, 1976; Sen. Amend. to Assem. Bill No. 2549 (1975-1976 Reg. Sess.) Mar. 16, 1976; Conference Amend. to Assem. Bill No. 2549 (1975-1976 Reg. Sess.) Assem., Aug. 30, 1976, Sen., Aug. 31, 1976.) Since the latter provision was added to the subdivision which contained a specific intent requirement, it is reasonable to conclude that the Legislature intended that requirement to apply to both "custodial" and "noncustodial parents."[6]

---

[5]Like section 278.5, this section (Stats. 1976, ch. 1399, § 10.5, p. 6315) was amended in 1983. (Stats. 1983, ch. 990, § 3.)

[6]Even if one were to ignore the legislative history of section 278.5, the most that can be said for the statute is that it is ambiguous as to whether a specific intent is required in cases involving "noncustodial parents." A possible ambiguity arises because the specific intent language can be interpreted as applying to both "noncustodial" and "custodial parents" or only to the latter.

In resolving such an ambiguity—assuming it exists—courts are "guided by well-settled principles of statutory interpretation. '[W]hen language which is reasonably susceptible of

Since every other statute in this area requires a specific intent, it is reasonable to conclude that the Legislature intended to require a specific intent in all section 278.5 cases.[7] Therefore, before an accused could be held criminally liable under section 278.5, the prosecution had to prove that he or she acted with the specific intent required by the statute.

This conclusion is reinforced by the Legislature's 1983 amendment of section 278.5, subdivision (a). (Stats. 1983, ch. 990, § 4.) The intent language in the amended version of section 278.5 clearly applies to "custodial" and "noncustodial parents" alike. That statute now provides in pertinent part: "Every person who in violation of the physical custody or visitation provisions of a custody order, judgment, or decree takes, retains, detains, or conceals the child with the intent to deprive another person of his or her rights to physical custody or visitation shall be punished by imprisonment in the state prison . . . ." With this amendment, the Legislature has laid to rest any doubts as to whether specific intent is required in section 278.5 cases involving "noncustodial parents."

What then, exactly, was the specific intent required by section 278.5? The statutory language punished those persons who took a child in violation of a custody decree "with the intent to deprive the other person of such right to custody or visitation." When the "noncustodial parent" was charged with violating section 278.5, the words "other person" referred to the person who had custody, i.e., the legal custodian. The phrase "such right" referred to a right to custody under a custody order, judgment or decree. Thus, for a "noncustodial parent," the specific intent required by the statute was the intent to deprive the legal custodian of his or her right to custody pursuant to a custody order, judgment or decree.

Since section 278.5 was a specific intent crime, an accused was entitled to have a jury consider any defense which applies to specific intent crimes and is supported by the facts in the case. A good faith mistake of law is

two constructions is used in a penal law ordinarily that construction which is more favorable to the offender will be adopted. [¶] The defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute.' [Citations.]" (*People* v. *Davis* (1981) 29 Cal.3d 814, 828 [176 Cal.Rptr. 521, 633 P.2d 186].) These principles support the conclusion that the statute should be read to have required the state to prove specific intent in *all* section 278.5 cases.

[7]Apparently, even the prosecutor in this case so concluded. The information charging the appellant included the specific intent language from section 278.5. It alleged in part: ". . . GENE MARTIN HOWARD did willfully, unlawfully and feloniously, in violation of a custody order, take, retain and conceal minor children, to-wit: RYAN A. HOWARD, born May 18, 1973, and CHAD M. HOWARD, born August 18, 1976, from PAMELA D. HOWARD, the person having the right to legal custody of such children *with the intent to deprive said PAMELA D. HOWARD, with* [sic] *the right to custody of such children.*" (Italics added.)

such a defense, if the mistake negates the specific intent required for the offense. (*People* v. *Butler* (1967) 65 Cal.2d 569, 573 [55 Cal.Rptr. 511, 421 P.2d 703]; *People* v. *Eastman* (1888) 77 Cal. 171, 172 [19 P. 266]; see 1 Witkin, Cal. Crimes, § 149; *People* v. *Devine* (1892) 95 Cal. 227, 228-231 [30 P. 378]; *People* v. *Photo* (1941) 45 Cal.App.2d 345, 352-353 [114 P.2d 71]; see also *People* v. *Vogel* (1956) 46 Cal.2d 798, 804 [299 P.2d 850].) It is clear that an honest or good faith mistake of law does not negate *general* intent. (See *People* v. *Vineberg* (1981) 125 Cal.App.3d 127, 137 [177 Cal.Rptr. 819].) However, there appears to be no California decision which holds that such a mistake does not negate *specific* intent.

Theft and robbery are examples of such crimes where a good faith mistake of law may negate specific intent. (*People* v. *Butler, supra,* 65 Cal.2d at p. 573.) In *Butler,* an individual was accused of felony murder based on the underlying crime of robbery. The evidence showed that the defendant had been employed by a man named Anderson, who had not paid him for some work. One evening, the defendant went to Anderson's home to collect payment. Anderson was killed in the course of the evening, and the defendant left with Anderson's wallet. At trial, the defendant testified that he intended only to recover the money which he was owed. (*Id.,* at pp. 571-572.) Although the crime of robbery requires the specific intent to deprive the owner permanently of his property, the trial court refused to allow the defendant to negate that intent by establishing the defense of an honest belief that he was entitled to the money. (*Id.,* at p. 572.)

On appeal, this court found the denial of the defense to be error and reversed the judgment. The court noted that "[i]t has long been the rule in this state and generally throughout the country that a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent. [Citations.]" (*Id.,* at p. 573.)

In an earlier case involving the crime of larceny, this court noted that "[i]t is one thing to take and carry off personal property with the intention to steal, and another to take it away under a mistaken idea of legal rights honestly entertained, and any fact or circumstance which tends to throw light upon the actual intent of the party charged with the felonious taking is pertinent evidence, and should be allowed to go to the jury." (*People* v. *Eastman, supra,* 77 Cal. at p. 172.) The good faith mistake of law defense has also been recognized with respect to other specific intent crimes. (*People* v. *Stewart* (1976) 16 Cal.3d 133, 139 [127 Cal.Rptr. 117, 544 P.2d 1317] [embezzlement]; *People* v. *Crowder* (1954) 126 Cal.App.2d 578, 586 [272 P.2d 775] [forgery].)

In a more analogous context, this court has recognized that an erroneous but good faith belief in the validity of a judgment of dissolution or annul-

ment may absolve an accused of criminal liability for the offense of bigamy. (See *People* v. *Vogel, supra,* 46 Cal.2d at p. 804.) The bigamy statutes (§§ 281, 282) provide that a person who remarries after his or her former marriage has been dissolved "by the judgment of a competent Court" is not guilty of bigamy. In *Vogel,* this court observed that it would not "be reasonable to hold that a person is guilty of bigamy who remarries in good faith in reliance on a judgment of divorce or annulment that is subsequently found not to be the 'judgment of a competent court'. . . ." (46 Cal.2d at p. 804.) The court reasoned that "[s]ince it is often difficult for laymen to know when a judgment is not that of a competent court, we cannot reasonably expect them always to have such knowledge and make them criminals if their bona fide belief proves to be erroneous." (*Ibid.*)

Clearly, an erroneous but good faith belief in the invalidity of a child custody order constitutes a defense to a violation of section 278.5. If the accused in good faith believes that the child custody order has been nullified as a result of a reconciliation with his spouse, then he does not entertain the specific intent required by the statute—i.e., "the intent to deprive the· [legal custodian] of such right to custody. . . ."

**MOSK, J.**—I dissent.

To reach their conclusion the majority assume there was a reconciliation, and that such reconciliation would automatically "cancel" the previous custody order of the court. They misread the testimony and the facts impliedly found by the jury, and they are in error on the law.

Although defendant claimed he and his ex-wife had reconciled, she—the mother of the children—admitted cohabitation and an attempt at reconciling, but testified *the reconciliation failed.* At most there was an *attempted* reconciliation. As the Chief Justice wrote in *In re Marriage of Modnick* (1983) 33 Cal.3d 897, 912 [191 Cal.Rptr. 629, 663 P.2d 187], "Mere cohabitation after entry of the interlocutory decree, even for a long period of time, does not establish that the parties have reconciled as a matter of law." In short, it takes two to reconcile.

The record discloses that after the interlocutory decree was entered, defendant moved into his ex-wife's home and for nearly a year they tried to adjust their marital differences. He was away from this temporarily reunited home for a considerable period of that time because of family illness in Colorado. Ultimately the attempted reconciliation failed, and the ex-wife filed for a final decree of divorce. In her application for the final decree she swore under oath that the parties had not reconciled.

At trial, the following testimony was offered by the ex-wife:

"Q. It's basically a request to have the interlocutory become final; is that correct? A. Yes.

"Q. And you signed that on July 14, 1980? A. Right.

"Q. Your attorney prepared the paper, I assume? A. Yes, he did.

"Q. On July 14, 1980, had Gene Howard left your house? A. Yes, he was in Colorado.

"Q. You were split up? A. Yes.

"Q. You had not reconciled? A. No.

"Q. You certainly had tried before, as you told us before? A. Yeah."

The jury heard the defendant's and the ex-wife's versions of the attempted reconciliation. The contentions of both parties were presented in full, and apparently the jury accepted the latter's depiction of the events. This is understandable, in view of the deception and stealth with which defendant abducted the children and secreted them from their mother. Had he genuinely believed that there was a reconciliation rendering the interlocutory decree invalid and thus that his lawful right to custody was equal to the mother's, it is inconceivable that he would have resorted to such deceit. To compound his egregious conduct, defendant thereafter refused to permit the children to communicate with their mother, even when they specifically asked to do so.

Here are the relevant portions of defendant's own testimony on cross-examination:

"Q. That's true, right, you were thinking about the [interlocutory] order? A. Yes, I was.

"Q. Thank you. When you went to pick up the children on August 5th, 1980, did you tell Mrs. Brown [the baby-sitter] that you'd have them back in one to two hours? A. Yes, I did.

"Q. Was that a lie? A. Yes, it was.

"Q. You in fact did not return the children; is that correct? A. No, I did not.

"Q. You in fact took the children to Colorado? A. Yes, I did."

When defendant was questioned further, he admitted his son Ryan asked to call his mother so that he could at least talk to her on the phone.

"Q. Did you let him talk to his mother? A. No, I did not.

". . . . . . . . . . . . . . . . . . . .

"Q. Did you let him talk to his mother at all in 33 days? A. No, I did not."

In light of the record and the conduct it revealed, there is little doubt the jury did not buy defendant's story that he believed there had been a reconciliation that wiped out the previous order awarding custody to the mother. Rather, the record discloses a defendant intentionally thwarting a lawful order of the court.

The crime described in Penal Code section 278.5 has three elements: (1) a custody decree; (2) an intentional taking of a child in violation of that decree; and (3) knowledge of the decree. This defendant—and the Chief Justice in her concurring opinion—now propose a fourth element: a subjective belief that the custody decree is valid.

In my opinion, this additional dimension would make child-stealing prosecutions extremely difficult, regardless of how egregious the offense, and it would encourage self-help rather than resort to legal process. Thereafter, rare indeed would be the defendant in a child-stealing case who did not assert his subjective belief that a prior custody award was invalid and hence the abduction of the child was permissible.

Section 278.5, subdivision (a), at the time of this offense provided: "Every person who in violation of a custody decree takes, retains after the expiration of a visitation period, or conceals the child from his legal custodian, and every person who has custody of a child pursuant to an order, judgment or decree of any court which grants another person rights to custody or visitation of such child, and who detains or conceals such child with the intent to deprive the other person of such right to custody or visitation shall be punished by imprisonment . . . ."[1] The purpose of this statute was to aid California courts in protecting children from extralegal hazards of custody disputes. (See generally Foster & Freed, *Child Snatching and Cus-*

---

[1]Section 278.5, subdivision (a), was amended in 1983. It now contains a specific reference to causing a child to be transported out of the state.

*todial Fights: The Case for the Uniform Child Custody Jurisdiction Act* (1977) 28 Hastings L.J. 1011, 1017; *Revue of Selected 1976 California Legislation* (1977) 8 Pacific L.J. 315, 317-318.) This purpose is achieved by encouraging those parents who are dissatisfied with custody or visitation provisions under an existing court order to seek judicial clarification or modification of their rights, rather than to employ self-help measures such as kidnaping or concealing the child from the other parent or custodian. (*People* v. *Lortz* (1982) 137 Cal.App.3d 363, 368 [187 Cal.Rptr. 89].)

This defendant sought neither clarification nor modification of the custody order. Nor did he take any steps to determine whether the custody order remained in effect. That there has been a reconciliation may not be claimed unilaterally. As declared in *Modnick, supra,* 33 Cal.3d at page 911, the burden of proof rests with the party asserting the reconciliation. A contention that there has been a genuine reconciliation should be asserted in court, in proceedings either to set aside the interlocutory decree or to resist entry of a final decree. This defendant took neither step. Instead, he now claims he formed his own legal conclusion as to the order's validity and as to his own rights thereunder. He then absconded with the children and concealed them from both their mother and the district attorney's investigator. This is precisely the type of conduct that section 278.5 was enacted to deter.

While defendant clearly has ignored the spirit of section 278.5, he nevertheless relies on this section as requiring a specific intent to deprive a person of legal custody of a child. Thus, he contends that his asserted mistake as to the continuing validity of the custody order should constitute a defense. He further argues that it was reasonable for him to believe that the attempted reconciliation with his former wife annulled both the interlocutory decree and the custody order. He concludes that because he did not believe the custody order was valid, he could not have had a specific intent to deprive his former wife of legal custody. His only intent, he asserts, was to exercise exclusive control over his children which, in the absence of a court order, he had a common law right to do. (*Wilborn* v. *Superior Court* (1959) 51 Cal.2d 828, 830-831 [337 P.2d 65] [in the absence of a custody order, a parent does not commit the crime of kidnaping by taking exclusive possession of a child].)

Section 278.5, both originally and as amended, describes two separate offenses, the first prohibiting a person *without custody* of a child from taking, retaining or concealing the child in a manner which would violate the terms of a custody decree, and the second prohibiting a person *with custody* of a child from detaining or concealing the child with the intent to deprive the other person of such right to custody or visitation. Obviously, the Legislature intended to differentiate between persons having legal custody of

the children involved and those who do not, requiring proof of a specific intent to deprive only with respect to persons previously awarded legal custody. The reason for this distinction appears to reflect a legislative willingness to give a benefit of the doubt to persons previously awarded custody of children by requiring a showing of specific intent to deprive the other parent or custodian of his or her rights. Thus, parties like this defendant, who do not have legal custody of the children, fall within the first part of section 278.5 and may be convicted of violating it without a showing of specific intent.

Indeed, if the Legislature had intended to require specific intent as an element of child stealing in all cases, it is doubtful that the separate parts of section 278.5 would have been enacted. The term "every person" in the first part of the statute would have sufficed to include both those without and those with custody rights; the addition would be mere surplusage. The more logical interpretation is that the Legislature intended to require no showing of specific intent in cases involving strangers or other persons lacking a claim of custody, and to require a showing of specific intent only in those cases involving custodians.

By its terms, then, section 278.5 is violated if there is an order regarding custody rights, an intentional taking, retention or concealment of a child, an act violating the custody order, and the act is committed with knowledge of the existence of the custody order.

The foregoing elements were fully satisfied here. First, a court order regarding custody and visitation rights existed in the form of the interlocutory decree of dissolution that granted the wife custody and defined defendant's visitation rights. This order was incorporated into the final decree of dissolution and defendant does not contend otherwise. Although the couple attempted a reconciliation, it ultimately failed and defendant has cited no persuasive authority showing that the custody provisions of the interlocutory decree were vitiated under these circumstances. Second, defendant admitted that he intentionally took, retained and concealed his children from their mother. Third, his act violated the custody order. Finally, defendant admitted that he knew of the interlocutory order which was incorporated into the final decree.

Defendant's claimed erroneous assumption regarding the order's continued validity was immaterial. (*People* v. *Snyder* (1982) 32 Cal.3d 590, 593 [186 Cal.Rptr. 485, 652 Cal.Rptr. 42].) He could readily have sought legal advice on the matter and returned to court seeking adjudication of the status of the custody order. Instead, and contrary to both the letter and spirit of section 278.5, defendant used unlawful self-help measures. His actions are

not excused merely because they are assertedly based on an incorrect legal conclusion. Indeed his stealth and deception in abducting and concealing the children cast doubt on any genuine belief in legal rights.

Although a mistake of law is a defense to some specific intent crimes (see *People* v. *Stewart* (1976) 16 Cal.3d 133, 139 [127 Cal.Rptr. 117, 544 P.2d 1317]; 1 Witkin, Cal. Crimes (1963) §§ 149-150, and cases cited), the statute at issue required only the intent to take, retain or conceal a child from a person awarded custody pursuant to court order. Such an intent was established here. Defendant's subjective doubts regarding the validity of that order do not negate a finding of such an intent.

I would affirm the judgment.